Filed 9/7/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>HENRY SIBRIAN,<br><br>      Defendant and Appellant. | A143369<br><br>(Contra Costa County<br>Super. Ct. No. 51408608) |

## INTRODUCTION

Defendant Henry Sibrian appeals from his conviction of resisting an officer in violation of Penal Code section 69.[1]  He contends the trial court erred, first, in allowing expert testimony on excessive force and, second, in precluding defense counsel from questioning one of the officers involved in his arrest about a pending civil lawsuit against the officer.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Shortly after 1:00 a.m. on October 21, 2013, Sheriff's Sergeant Joseph Buford observed defendant commit various traffic violations.  As Buford turned on the flashing lights of his patrol car to initiate a traffic stop, defendant pulled over on his own because he had arrived at his house.  Buford ordered defendant to get out of his car, but he refused.  Additional deputies arrived, and defendant was wrestled out of the car and detained.  During the struggle, defendant and two deputies were injured.  The district attorney charged defendant with a single count of resisting an executive officer by the use of force or violence.  (§ 69.)

---

[1]  All further statutory references are to the Penal Code unless otherwise indicated.

1

Sergeant Buford testified at trial that he first noticed defendant's car when he heard squealing tires. He followed the car about a mile as it ran two red lights and a stop sign and then pulled over and came to a stop on Sheryl Drive in San Pablo. Buford knew the neighborhood, as he had responded to "homicides, domestic violence, stolen vehicles, robberies, fights, [and] drunks" in the area. He drew his firearm at low ready[2] and ordered defendant to show his hands. Defendant stuck both hands out the driver's side window, along with the upper half of his body. Defendant was "slurring and rambling." Buford could not understand him and believed he might be intoxicated.

Buford called for assistance, and Deputy Mitch Moschetti arrived almost immediately. Together, they approached defendant's car, and Buford opened the driver's side door. He ordered defendant "at least five or six times" to get out, but he refused. Defendant smelled of alcohol. He continued to ramble and was "gripping the steering wheel with two hands." Both officers tried to pull defendant out of the car, but he "was flailing his body." Although he suspected defendant was intoxicated, Buford did not conduct a field sobriety test and did not obtain a blood sample.

Deputy Moschetti testified he struggled with defendant for a few seconds, while telling him to stop resisting and get out of the car. Then he "delivered a closed fist strike" to defendant's right eye. He again tried to move defendant, but defendant grabbed Moschetti's arm and moved it "very forcefully." Moschetti punched him in the right eye a second time.

Moschetti retrieved his Taser and told defendant to stop resisting or he would be tased. Defendant grabbed the Taser and tried to pull it from Moschetti's hand. Moschetti tased him in the stomach. By this time, another deputy, Michael Santos, had arrived, and he was able to pull defendant out of the car. Defendant's face and stomach hit the asphalt, and he landed flat on his stomach.

---

[2] Holding a firearm at "low ready" means holding a firearm in both hands "pointed in a downward direction, so it's not pointed at any one person, but it's ready in case you have to deploy it."

Now on the ground, defendant kept his right arm tucked underneath his stomach and kicked his legs. Moschetti told him to stop resisting and put his hands behind his back. After unsuccessfully trying to pull defendant's right arm out from under his body, Moschetti "delivered a closed fist strike to his right rib cage." Defendant released his right arm, and Moschetti placed him in handcuffs. Defendant became "verbally aggressive" and spat blood on Santos.

Moschetti suffered cuts on his hands and bruises on his shins. Defendant also appeared to be injured. There was blood around his right eye and blood from his nose, and he had injuries on the left side of his head and on his right cheek.

Deputy Santos testified that when he arrived at the scene defendant appeared "aggressive" and was "actively resisting." Defendant scratched Santos with his fingernails, inflicting a four inch gash on his forearm. After Santos pulled him from the car to the ground, defendant continued to struggle and kick. Another deputy arrived, and Santos, Moschetti, and Trinidad eventually got defendant under control and handcuffed. Defendant continued to be uncooperative—he yelled, failed to follow instructions, and spat a mouthful of blood on Santos's left arm. Santos suffered an open wound on his left hand and wounds on his right hand and arm.

The prosecution also called George Driscoll, a senior inspector with the district attorney's office, whom the trial court permitted to testify as an expert "in the area of law enforcement training, law enforcement tactics, and law enforcement procedures regarding the use of force." Driscoll had 34 years' experience in law enforcement, and has trained law enforcement officers in Fourth Amendment issues and use of force, including specific defensive tactics and methods to overcome resistance. He testified law enforcement officers have a responsibility to enforce the law, and when "they encounter resistance, they're not expected to retreat, they're expected to ensure compliance."

The prosecutor presented a hypothetical scenario of an officer stopping a car for numerous traffic violations at 1:00 a.m. in a medium to high crime area. The prosecutor then questioned Driscoll about hypothetical officer conduct tracking the version of events described by Buford, Moschetti, and Santos. Driscoll opined the officers' conduct in the

3

hypothetical scenario would not be inconsistent "with the industry standard." For example, Driscoll testified when a suspect's unlawful driving threatens the public, an officer is expected to stop that threat by having the suspect stop and step out of the car. If the suspect refuses to leave his car, the officer is at a disadvantage because the suspect has "complete access to everything in the car, and . . . maneuverability inside the car." There could be a weapon in the car, or the suspect could start the car and flee. Driscoll opined if the suspect grips his steering wheel and refuses to get out, officers should attempt to grab his arm to break his grip and use a distraction strike only if they are unable to break the suspect's grip on the steering wheel. He explained officers oftentimes have chemical agents and Tasers "as part of their tool system on their belt." The use of a chemical spray "probably wouldn't be a good choice for the officers to select" in the circumstances of the hypothetical because dispersal of the spray in the small area of the suspect's car could impair the officers.[3] But if two distraction strikes are ineffective in removing the suspect's hands from the steering wheel, Driscoll opined use of a Taser would not be inconsistent with industry standard.

On cross-examination, Driscoll stated he had testified 12 times as an expert in the use of force by law enforcement officers. In each case, he concluded the use of force was consistent with industry standards. Revisiting the hypothetical scenario, Driscoll opined that if the first officer were to point his gun at the head of the suspect, that would *not* be consistent with industry standards. He was aware of Contra Costa County's policy that Tasers should not routinely be used when subjects are demonstrating passive resistance or are unresponsive.

Israel Herrera, defendant's landlord, testified for the defense. He saw defendant parked outside his house, with police cars behind him. An officer pointed a weapon toward defendant and told Herrera to stay back. Two more officers parked in front of the house. They started to hit defendant inside his car. Herrera never heard the officers

---

[3] Driscoll also noted the chemical agent may have a decreased effect on a person under the influence of alcohol.

4

telling defendant to get out of the car. "They pulled him out of the car, he was on the floor and then he was handcuffed."

Defendant also testified. Around 10:30 p.m. the night of his arrest, he left work and went to a friend's house in Berkeley. He "might have had a couple of drinks." (Later, he testified he had one 22-ounce beer.) Around 12:30 a.m., he left his friend's house and drove home. He did not run any red lights or stop signs, and did not notice a police officer following him. As soon as he parked, he saw police lights. An officer approached his window, pointed a gun at his face, and ordered him to put out his hands, which he did. Defendant "thought he was going to shoot." Another officer arrived, and the two officers forced him out of his car. The officers never ordered him to exit the car. After he was handcuffed, he felt "a whole bunch of punches just coming in different directions, right, left, temple, jaw, the back of [his] head." He felt a knee hit his eye, and he started yelling "police brutality." Blood filled his mouth, and he spat it out because he could not breathe. He did not intend to get blood on anyone. Then he felt a burning sensation in his chest from a Taser. He was tased three times and taken to jail. From there, he was taken to a hospital, where he stayed from 2:00 a.m. to 5:30 p.m. Photographs showed marks from the Taser on defendant's chest, stomach, and shoulder.

Defendant denied holding on to the steering wheel, denied refusing to exit his car, and denied resisting the officers at any time. "It was like lamb to a slaughter. I gave myself completely to them and— [¶] . . . [¶] I did every order they gave me." He plans to file a civil lawsuit against Deputy Moschetti.

The jury found defendant guilty as charged. The trial court placed him on formal felony probation for three years, conditioned on serving 180 days in county jail.

DISCUSSION

A.   *Allowing Expert Testimony on the Use of Force*

Defendant maintains the issue of whether the officers used excessive force was not a proper subject for expert testimony under Evidence Code section 801. Alternatively, he contends the trial court should have excluded the testimony under Evidence Code section 352 as unduly prejudicial.

5

Evidence Code section 801 allows a qualified expert to testify on matters "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a); *People v. Brown* (2004) 33 Cal.4th 892, 900 [16 Cal.Rptr.3d 447, 94 P.3d 574].) "Expert opinion is not admissible," however, "if it consists of inferences and conclusions which can be drawn as easily and intelligently by the trier of facts as by the witness." (*People v. Torres* (1995) 33 Cal.App.4th 37, 45 [39 Cal.Rptr.2d 103].) We review a decision to admit expert opinion testimony for abuse of discretion. (*People v. Prince* (2007) 40 Cal.4th 1179, 1222 [57 Cal.Rptr.3d 543, 156 P.3d 1015] (*Prince*).)

Defendant was charged with "knowingly resist[ing], by the use of force or violence, [an executive] officer, in the performance of his [or her] duty" in violation of section 69. Under this penal code provision, an officer must be acting lawfully when the resistance occurs. (*In re Manuel G.* (1997) 16 Cal.4th 805, 814, 816 [66 Cal.Rptr.2d 701, 941 P.2d 880].) An officer using excessive force is not acting lawfully. (*People v. Olguin* (1981) 119 Cal.App.3d 39, 45 [173 Cal.Rptr. 663]; *People v. White* (1980) 101 Cal.App.3d 161, 167 [161 Cal.Rptr. 541].) Thus, the prosecution was required to prove beyond a reasonable doubt that the officers acted lawfully, and the jury was instructed "[a] peace officer is not lawfully performing his or her duties if he or she is . . . *using unreasonable or excessive force* in his or her duties." (Italics added.)

In response to defendant's motion to exclude Driscoll's testimony, the trial court held an Evidence Code section 402 hearing. Driscoll testified law enforcement officers are required to receive training on the use of force, and the purpose of the training is to enhance the safety of officers, suspects, and the public. An officer's prior "common life experience regarding combative or forceful situations" is not sufficient because a "law enforcement officer has a significant greater responsibility, duty, obligation, regarding the enforcement of the laws" than a lay person. Driscoll explained an officer is expected to overcome a person's noncompliance with lawful commands, and officers receive specialized training to recognize resistance because they "have to try and minimize the escalation of resistance." "[T]heir training will allow them to recognize this, and then use

6

appropriate means to overcome that resistance." He stated officers are taught to escalate their level of force if their tactics are not effective in overcoming resistance. Driscoll gave the example of a suspect who is refusing to follow commands and is on the ground with his hands underneath his body. An officer would recognize the inability to see the suspect's hands is a safety issue, and "would then use greater force to extract the hands."

At this point in Driscoll's testimony, the trial court observed it appeared to be helpful and to cover matters beyond the common experience of an ordinary juror. "[W]hat I've heard so far, there are many things here that a normal juror does not understand. The principles for escalation of force, for example. That's nothing that's naturally understood by a juror. [¶] . . . Inspector Driscoll gave the example of the suspect who is forced to the ground and was lying on top of his hands. And so because the officer doesn't know what's in his hands, the officer, according to Inspector Driscoll, has more latitude in what he can do. I'm not sure that's something that is naturally known to a jury. [¶] I think there are many points like that. So I think subject to further testimony in cross-examination, this information . . . is something that would be helpful to a jury."

After further testimony by Driscoll, the court heard argument by the parties. It then ruled Driscoll could testify as an expert "because the issues of incremental use of violence and the kind of force that can be used . . . those are not issues that a jury understands without testimony from an expert." However, Driscoll could not testify that the officers' conduct was either reasonable or constituted excessive force—it would be "up to the jury to decide whether the use of force is reasonable."

Defendant contends Driscoll's testimony "was unnecessary" because "the jury was perfectly capable of evaluating the reasonableness of the force used against [defendant] based on the evidence presented at trial." Necessity, however, is not the measure for the admissibility of expert evidence. "[E]xperts may testify even when jurors are not 'wholly ignorant' about the subject of the testimony. [Citation.] '[I]f that [total ignorance] were the test, little expert opinion testimony would ever be heard.' [Citation.] [¶] Rather, the pertinent question is whether, even if jurors have some

knowledge of the subject matter, expert opinion testimony would assist the jury." (*Prince*, *supra*, 40 Cal.4th at p. 1222.)

Here, one of the key issues for the jury was whether the officers acted lawfully in the way in which they detained and arrested defendant. Driscoll's testimony could be of some assistance because, as the trial court observed, jurors would not necessarily know about the need for escalating force in response to a noncompliant suspect or the potential continued danger posed by a suspect after he has been wrestled to the ground. Driscoll also explained the risks of allowing a noncompliant suspect to remain in his car and why the officers may have decided not to use a chemical agent.

Expert testimony " 'will be excluded *only* when it would add nothing at all to the jury's common fund of information, i.e., when "the subject of inquiry is one of such common knowledge that men of ordinary education could reach a conclusion as intelligently as the witness" ' [citation]." (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300 [283 Cal.Rptr.2d 382, 812 P.2d 563], italics added.) Because we cannot say Driscoll's testimony "would add nothing at all to the jury's common fund of information," we also cannot say the trial court abused its discretion in deeming it admissible. (*Ibid.*; *People v. Farnam* (2002) 28 Cal.4th 107, 162–163 [121 Cal.Rtpr.2d 106, 47 P.3d 988].)

Defendant's reliance on *Allgoewer v. City of Tracy* (2012) 207 Cal.App.4th 755 [143 Cal.Rptr.3d 793] (*Allgoewer*), a civil excessive force case, is misplaced. In *Allgoewer*, the trial court granted the defendants' nonsuit motion because the plaintiff had not presented any expert testimony on " 'what force a reasonable law enforcement officer would have used under the same or similar circumstances.' " (*Id.* at p. 757.) The Court of Appeal reversed, concluding, as have other courts, that there is no per se requirement that a plaintiff must present expert testimony to prove an excessive force claim. (*Id.* at pp. 763–764.) The appellate court recognized that the "reasonableness" standard applicable to such claims " 'must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.' " (*Id.* at p. 762.) And since " 'the standard is not defined by the generic—a reasonable *person*—but rather by the

specific—a reasonable *officer*—it is more likely that [the] line between common and specialized knowledge has been crossed.' " (*Id.* at p. 763, quoting *Kopf v. Skyrm* (4th Cir. 1993) 993 F.2d 374, 378 (*Kopf*).)  However, " 'a blanket rule that expert testimony is generally admissible in excessive force cases would be just as wrong as a blanket rule that it is not.' " (*Allgoewer*, at p. 763.)  " 'The facts of every case will determine whether expert testimony would assist the jury.' " (*Ibid.*)

Where the force used consists of only bare hands, the court suggested " 'expert testimony might not be helpful.' " (*Allgoewer, supra*, 207 Cal.App.4th at p. 763.) However, "[a]dd handcuffs, a gun, a slapjack, mace, or some other tool, and the jury may start to ask itself: what is mace? what is an officer's training on using a gun?" (*Ibid.*) " 'Answering these questions may often be assisted by expert testimony.' "[4] (*Allgoewer,* at p. 763.)

The *Allgoewer* Court went on to conclude that, on the record before it, a nonsuit was not warranted.  While the defendant officers argued expert testimony was necessary because the case " 'involved specialized training and experience regarding police practices and procedures,' " "beyond that vague assertion, defendants offer no explanation of why or how that was so." (*Allgoewer, supra*, 207 Cal.App.4th at p. 765.)

In short, *Allgoewer* holds the admission of expert evidence on police training and practices must be made on a case-by-case basis and, in some civil excessive force cases, as in the case before it, the plaintiff need not present expert testimony to prove his or her case.  *Allgoewer* does not hold a plaintiff cannot present such testimony.  In fact, it recognizes that, depending on the circumstances, such evidence may be proper.  It is, thus, no surprise that expert testimony on the use of force has often been admitted in California excessive force cases without objection.  (See, e.g., *Mendoza v. City of West Covina* (2012) 206 Cal.App.4th 702, 710 [141 Cal.Rptr.3d 553]; *Lopez v. City of Los Angeles* (2011) 196 Cal.App.4th 675, 682–683 [126 Cal.Rptr.3d 706]; *Munoz v. City of*

---

[4] In *Kopf*, quoted extensively in *Allgoewer*, the circuit court concluded the district court abused of discretion in *excluding* the plaintiff's proffered experts on law enforcement use of dogs and slapjacks. (*Kopf*, *supra*, 993 F.2d at pp. 378–379.)

*Union City* (2004) 120 Cal.App.4th 1077, 1090–1093 [16 Cal.Rptr.3d 521], disapproved on other grounds by *Hayes v. County of San Diego* (2013) 57 Cal.4th 622, 639, fn. 1 [160 Cal.Rptr.3d 684, 305 P.3d 252].)

The instant criminal case presents a different issue than that in *Allgoewer*—did the trial court abuse its discretion in allowing such evidence in this criminal prosecution? Moreover, *Allgoewer* suggests it did not, since more was involved here than force " 'reduced to its most primitive form—bare hands.' " (*Allgoewer, supra*, 207 Cal.App.4th at p. 763, quoting *Kopf, supra,* 993 F.2d at p. 379.) In this case, the officers were dealing with a suspected drunk driver who refused to get out of his car, late at night and in a relatively high crime area. The officers used not only their hands, but also a Taser and handcuffs, and they chose not to use a chemical agent. Driscoll's testimony provided relevant context and a basis for evaluating the officers' handling techniques and choice of assistive tools.

Defendant alternatively maintains that, even if Driscoll's expert testimony had some relevance and was admissible under Evidence Code section 801, it nevertheless should have been excluded under Evidence Code section 352. He contends the testimony was unduly prejudicial because Driscoll "convey[ed] his belief in the credibility of the officers' testimony." This overstates Driscoll's testimony. When presented with a hypothetical scenario tracking the officers' testimony, Driscoll gave his opinion on the use of force, but he did not suggest either of the arresting officers' version of events was correct or that the officers were credible and defendant was not. Nor, contrary to defendant's claim, did Driscoll refuse "to answer questions based on hypotheticals that contradicted the prosecution's theory." On cross-examination, when asked a different hypothetical, Driscoll opined an officer pointing a firearm at a suspect's head (as defendant testified Sergeant Buford did) would not be consistent with industry standards. Defense counsel then asked if "the officer is able to the see the suspect's hands, and *weapons at that time are not a concern*," would that change Driscoll's opinion? (Italics added.) Driscoll responded "By limiting the factors as you just did, that's inconsistent with all of the factors that the officer is forced to consider." This was not a refusal to

answer a question based on a hypothetical scenario different from the prosecution's theory. Rather, Driscoll was pointing out that an officer could not simply put aside concerns about weapons in the hypothetical scenario described.

Defendant also cites to *Thompson v. City of Chicago* (7th Cir. 2006) 472 F.3d 444 (*Thompson*), another civil excessive force case, in which the district court excluded proffered testimony by two officers not on the ground it was inadmissible, but on the ground its prejudicial effect outweighed it's probative value. (*Id*. at p. 457.) The circuit court of appeals found no abuse of discretion, observing "[i]ntroducing two experts to testify that [the defendant-officer] used excessive force would have induced the jurors to substitute their own independent conclusions for that of the experts." (*Id.* at p. 458.)

Generally, " '[a] finding of no abuse of discretion in one court's exclusion of evidence has no bearing on whether a different court abused its discretion in admitting evidence in a different trial.' " (*People v. Cordova* (2015) 62 Cal.4th 104, 134 [194 Cal.Rptr.3d 40, 358 P.3d 518]. Here, in contrast to *Thompson*, Driscoll was not called to give his opinion on the legal question of whether the officers used excessive force, but to explain law enforcement tactics and training in the use of force. In fact, the trial court expressly barred Driscoll from rendering any opinion on whether the arresting officers' use of force was reasonable.

After briefing was complete in this appeal, another division of this court issued its opinion in *People v. Brown* (2016) 245 Cal.App.4th 140 [199 Cal.Rptr.3d] (*Brown*), holding the trial court abused its discretion in allowing expert testimony on use of force in a section 69 criminal case. We requested, and the parties provided, supplemental briefing on the opinion's significance to this case.

In *Brown*, the 67-year-old defendant was riding a bicycle on the sidewalk at dusk while wearing headphones and without a light, in violation of municipal code and Vehicle Code provisions. An officer yelled at him to stop, and Brown tried to flee on his bicycle. Two officers pursued, first in patrol cars and then on foot, and arrested him after a brief altercation. (*Brown, supra*, 245 Cal.App.4th at p. 145.) The jury found Brown guilty of resisting an officer in violation of section 69 and two drug offenses. The Court

of Appeal conditionally reversed the section 69 conviction because the trial court failed to sua sponte instruct on the lesser included offense of assault. (*Brown*, at p. 155.)

The appellate court went on to address defendant's claim of evidentiary error, concluding the trial court had also erred in allowing expert testimony on use of force because it had "added nothing to the common fund of information that any juror would have brought to the jury room, and . . . inaccurately addressed the governing law." (*Brown*, *supra*, 245 Cal.App.4th at p. 165.) "Because these officers used 'force . . . reduced to its most primitive form—the bare hands' " (*Kopf*, *supra*, 993 F.2d at p. 379), this was not a case in which the proper handling of some specialized law enforcement tool (e.g. a gun, a dog, a Taser, Mace, pepper spray) had to be explained." (*Brown*, at p. 165.) Further, the expert had also been allowed to testify about the meaning and application of section 835[5] and about United States Supreme Court case law on reasonable force under the Fourth Amendment. Moreover, his testimony was "based on an inaccurate rendition of the law." (*Brown*, at p. 169.)

The *Brown* court also recognized, however, that "the correct analysis is case by case and very much dependent on the particular facts presented." (*Brown*, *supra*, 245 Cal.App.4th at p. 163.) As we have discussed, this case did not involve merely "bare hands," but a more nuanced set of circumstances. Nor was Driscoll allowed to expound on the law, let alone erroneously, as was the case in *Brown*.

In any event, even if Driscoll's testimony should have been excluded, there was no prejudicial abuse of discretion. The jury heard the testimony of all those involved in, or who witnessed, the incident. Defendant, himself, testified. The jury was properly instructed that it was tasked with deciding the facts and determining witness credibility, and that the prosecution was required to prove each element of the offense beyond a reasonable doubt. (CALCRIM Nos. 200, 220, 226.) It was further instructed that it was not required to accept an expert's opinion as true or correct and, with respect to

---

[5] Section 835 provides, "An arrest is made by an actual restraint of the person, or by submission to the custody of an officer. The person arrested may be subjected to such restraint as is reasonable for his arrest and detention."

12

hypothetical questions posed to an expert witness, "[i]t is up to you [the jury] to decide whether an assumed fact has been proved." (CALCRIM No. 332.) We must presume the jury followed these instructions (see *People v. Alfaro* (2007) 41 Cal.4th 1277, 1326 [63 Cal.Rptr.3d 433, 163 P.3d 118]), and given the credibility determinations the jury plainly made, abundant evidence supports the verdict.

Defendant argues a question the jury asked during deliberations indicates this was a close case, and Driscoll's testimony may have tipped the balance in favor of conviction. The jury sent a note to the court asking: "Please provide clarification (definition and/or criteria) differentiating between 'used force . . .' of [Penal Code section] 69 and 'willfully resisted of PC 148.' "[6] This request does not suggest a "close case" as to the issue on which Driscoll's testimony was relevant—that is, whether the *officers* acted with reasonable force. Rather, the question suggests the jury had determined the officers acted lawfully and were grappling with whether *defendant's* conduct amounted to use of force.

**B.** ***Precluding Questioning on Pending Lawsuit Against Deputy Moschetti***

During trial, defense counsel notified the court she wanted to impeach Deputy Moschetti with questions about a civil lawsuit against him. Outside the presence of the jury, counsel stated the lawsuit alleged Moschetti deployed his Taser in October 2012 on a 58-year-old man held at the Martinez Detention Facility, and the man later died. Counsel did not know whether any administrative hearing had been conducted on the detainee's death, but "some internet searching" indicated a coroner's inquest had determined the death was an accident. Counsel asserted she would not "be able to call a witness to explain what happened because the person was dead." She therefore asked leave to ask Moschetti during cross-examination: "[D]id you deploy your Taser at the Martinez Detention Facility, in a manner that has been alleged to have been excessive— in a manner of excessive force?"

---

[6] The jury was instructed on willfully resisting an officer in violation of section 148 as a lesser included offense of resisting an officer by force or violence in violation of section 69.

13

The trial court responded: "[T]he only basis for saying it's alleged . . . is a civil lawsuit by—brought [by] John Burris on behalf of surviving family members. And as everybody knows, anybody can sue anybody and say anything. So the fact that there's a lawsuit pending, I don't see the relevance here." Defense counsel posited the existence of the pending lawsuit would show "bias in terms of fear of a subsequent suit" and "prior bad acts or acting in an aggressive manner." The prosecutor maintained there was no evidence of alleged excessive force committed by Moschetti, and any suggestion of such conduct would be highly inflammatory and improper. Ultimately, the trial court denied defense counsel's request, observing if there were a witness to the alleged excessive force, that witness could testify, "[j]ust as the person [witness] could in any *Pitchess* case where the evidence is admissible."[7] In this case, however, defense counsel was "not able to prove the prior bad act—[¶] . . . [¶] —by the standard necessary, preponderance of the evidence." The court also rejected the argument the lawsuit was relevant to show bias.

On appeal, defendant contends "[t]he trial court abused its discretion by excluding otherwise admissible evidence that Deputy Moschetti had used excessive force against a detainee." But defendant offered no "admissible evidence" showing Moschetti used excessive force against a detainee. Defense counsel admitted she had no witnesses to establish the facts of the alleged incident. In fact, it does not appear she even offered the civil complaint as evidence of the specific allegations. At one point in the discussion, the trial court said to defense counsel "You just have what some legal assistant from John Burris'[s] office . . . has told you about what he or she understands happened. . . . I wouldn't permit any questions about that, based on that showing." Defendant cannot

---

[7] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531, 537 [113 Cal.Rptr. 897, 522 P.2d 305] (where defendant was charged with battery of four deputies, evidence of "disciplinary records . . . necessary as character evidence of the deputies' tendency to violence in support of [defendant's] theory of self-defense" was "unquestionably relevant and admissible under Evidence Code section 1103").

14

claim he was improperly barred from presenting relevant, admissible evidence, when he has not identified any such proffered evidence in the record.[8]

In any case, even if the trial court abused its discretion in precluding the cross-examination question, there was no prejudice. Had defense counsel been allowed to ask Moschetti whether a civil lawsuit against him *existed*, whatever his response would have had little, to no, probative value regarding either his credibility or whether he had used excessive force on another occasion. And, it would have had no relevance to the credibility of Buford, Santos, Herrera, and defendant. Under these circumstances, it is not reasonably probable defendant would have obtained a better result had defense counsel asked Moschetti about the existence of the lawsuit.[9]

## DISPOSITION

The judgment is affirmed.

_____
Banke, J.

We concur:

_____
Humes, P. J.

_____
Dondero, J.

---

[8] For the same reasons, the trial court's evidentiary ruling did not violate defendant's constitutional rights. (See *People v. Boyette* (2002) 29 Cal.4th 381, 427–428 [127 Cal.Rptr.2d 544, 58 P.3d 391] [rejecting "attempt to inflate garden-variety evidentiary questions into constitutional ones"].)

[9] We therefore need not, and do not, address defendant's assertion the trial court incorrectly required him to establish admissibility by a "preponderance of the evidence." As we have explained, defendant made no *evidentiary* showing. And even if he had, any abuse of discretion in excluding the question and hoped for answer was not, on this record, prejudicial.

15

Trial Court:                               Contra Costa County Superior Court

Trial Judge:                               Honorable Lewis A. Davis


Siri Shetty, under appointment by the Court of Appeal for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Jeffrey M. Laurence, Senior Assistant Attorney General, Laurence K. Sullivan and René A. Chacón, Supervising Deputy Attorneys General, for Plaintiff and Respondent.