Filed 8/24/18

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>  v.<br><br>SEAN PATRICK REARDON,<br><br>     Defendant and Appellant. | C083482<br><br>(Super. Ct. Nos. CM042637,<br>CM041189, CM042429) |

APPEAL from a judgment of the Superior Court of Butte County, Michael R. Deems, Judge. Affirmed and remanded with directions.

Rachel Varnell, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Kathleen A. McKenna, Craig S. Meyers, Deputy Attorney General, for Plaintiff and Respondent.

---

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts I and III.

1

Defendant Sean Patrick Reardon appeals from his conviction for resisting an executive officer (Pen. Code, § 69),[1] arguing the officer's use of excessive force negated an essential element of that offense. In a related claim, defendant argues the trial court abused its discretion in denying his request to present the testimony of a use-of-force expert at trial.

As we explain, ample evidence supports the resisting count. Further, although the trial court excluded defendant's expert testimony for unsound reasons, defendant has not demonstrated prejudice. We remand with directions to address sentencing errors and correct the abstract of judgment but otherwise affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

We describe the facts surrounding use of force in some detail, as the officers' use of force is the focus of both defendant's claims on appeal. As we will explain, defendant resolved three of the charges against him pretrial, proceeding to trial only on charges of evading (Veh. Code, § 2800.2; count 1), resisting an executive officer (Pen. Code, § 69; count 5), and misdemeanor hit and run (Veh. Code, § 20002, subd. (a); count 6). He challenges only his conviction on count 5, resisting.[2]

*Prosecution case at trial*

On February 18, 2015, Officer Jack Ditty of the Chico Police Department was on patrol and saw defendant driving a blue Chevrolet Suburban and revving its engine. Leander Hutcherson was also in the Suburban with defendant. Ditty followed the vehicle and saw that it had a broken brake light and an expired registration. Ditty turned on his

---

[1] Undesignated statutory references are to the Penal Code.

[2] Defendant waived jury in a different pending case charging failure to appear (FTA), case No. CM042429 (the FTA case), and it was trailed to the conclusion of the trial. It was sentenced at the same time as the trial case, together also with a 2014 felon in possession case, No. CM041189 (the gun case), not otherwise accounted for in the record but also included on the abstract of judgment with the FTA and the trial case.

lights and sirens in order to initiate a traffic stop, but defendant accelerated and ran a stop sign.

After making several more turns, the vehicle pulled over and Officer Ditty called for backup, got out of his car, and pointed his handgun at the Suburban. Fearing that defendant had weapons or would drive off again, Ditty instructed, "Let me see your hands, stick your hands out the window." Defendant held his hands out of the window, but began yelling and screaming in a "b[izzare] kind of state of mind, or way." Suddenly, defendant pulled his hands inside the Suburban and drove away. Ditty got back in his patrol car and followed defendant, with his lights and sirens on. Defendant continued driving, ran a stop sign, and hit a black car. After approximately another two minutes of driving, he crashed into a parked car and stopped. Defendant got out of the Suburban and walked across the street. He was "screaming and acting b[izzare]," including yelling, " 'You're not the police' " and "a lot of unintelligible things." Ditty instructed defendant to get on the ground, but defendant continued walking away. Defendant's passenger Hutcherson, who was still in the Suburban, complied with Ditty's instructions to keep his hands up. Ditty was unsure if there was another passenger in the Suburban; he stayed alert but continued to monitor defendant.

As another officer (Wayne Rockwell) arrived to assist, defendant was repeatedly getting down on the ground, standing up, reaching in his pockets, and throwing things on the ground. Rockwell believed defendant posed a risk to officers and the public because he was "acting erratically" and "out of control." Further, defendant's Suburban posed a risk because it was still occupied and could be used to flee or as a weapon. Defendant continued to yell, move around, and disregard Officer Ditty's instructions to stay on the ground and keep his hands out of his pockets. Defendant began to walk "briskly" toward Ditty, which Rockwell interpreted as an aggressive attempt to approach and hurt the officers. Rockwell testified he told Ditty to "take him [defendant]."

Ditty then tackled defendant, grabbing his wrists in an unsuccessful attempt to control him. Defendant tensed up and grabbed Ditty by his vest near his armpit, pulling Ditty toward him. As defendant and Ditty struggled on the ground, defendant ripped off

3

Ditty's radio microphone and shirt pocket. Defendant ignored Ditty's commands to let go. Ditty was afraid defendant had a weapon; he felt "vulnerable." When defendant tried to stand up, Ditty punched him three times in his side, in an attempt to loosen his grip. Defendant eventually let go and began flailing around on the ground as he screamed, with his hands near his waistband. Defendant seemed strong, and Ditty felt unable to get him under control.

Rockwell noted defendant could access Ditty's "tools" and feared he would hurt someone, so he intervened and wrestled with defendant, instructing him to stop resisting and show his hands. Rockwell inflicted three "distraction blows" to the side of defendant's head, in an unsuccessful attempt to secure his arm. Defendant continued to resist, keeping his hands toward his waistband and screaming "nonsense." Ditty had "exhausted the hands-on techniques" to subdue defendant, so he used his baton to strike defendant five times in the lower legs and once in the lower front torso, in an unsuccessful attempt at "pain compliance." Ditty felt threatened and wanted to handcuff defendant quickly, in part because defendant kept placing his hands in his waistband. Ditty had watched 50 to 75 videos of officers being shot, and "usually" the suspects pulled the gun from their waistband area. Rockwell agreed with that assessment. Ditty decided to use a baton instead of pepper spray or his Taser because there was less risk to the officers from the baton. Also, in Ditty's experience, the Taser was only a single-use weapon and was unreliable.

At this point, Officer Jeffrey Kozak intervened and grabbed defendant's left arm, enabling Ditty to handcuff him. He continued to resist, flailing his body around and kicking. The officers placed leg restraints on him, but he continued to struggle as the officers placed him in a police vehicle and put a spit hood on him. To Ditty, defendant appeared "really animated," as if he had taken a central nervous system stimulant.

After his arrest, defendant was transported to the hospital, where he was sedated. His blood-alcohol level was 0.14 percent. His urine screening was positive for amphetamine, methamphetamine, cocaine, and cannabinoids.

Dr. John Whitman, who treated defendant the night of the incident, testified defendant was "very agitated" and conscious, but unable to answer basic questions. Defendant was "thrashing," and "a threat to himself and others." Although defendant showed signs of head trauma, a CT scan revealed no fractures or internal bleeding. X-rays were negative for rib fractures. Defendant was admitted for acute delirium, which Dr. Whitman believed was substance induced.

Defendant also showed signs of severe dehydration. In sum, he had suffered minor traumas, scrapes, and abrasions; and a "severe altered mental status combined with severe agitation," due to illicit drug use. A video taken of defendant at the hospital was played for the jury; defendant is seen and heard yelling incoherently and unintelligibly, and is nonresponsive to questions and commands. Each of the three officers testified defendant's behavior during the video was similar to his behavior during the confrontation.

Ditty testified he had been a peace officer for over three years and had been trained on control techniques and his department-issued tools, including his baton. Rockwell testified he had been a police officer for 16 years and had training and experience with the use-of-force tools, including distraction blows. During the incident, his main concern was to "get [defendant] under control, and get him restrained," as defendant had already shown his "willingness to flee [and] to fight with officers." Rockwell believed force was necessary because defendant disregarded verbal commands and posed a serious threat. Defendant never punched, kicked, swung, or grabbed at Rockwell.

Both Ditty and Rockwell testified they never saw defendant with a weapon. Kozak, who had been a peace officer for seven years, testified he believed defendant posed a danger because he was disregarding the officers' commands, struggling with the officers, and "screaming nonsense."

Officer Paul Ratto interviewed defendant on February 22, 2015. Defendant initially claimed he was the passenger but eventually admitted he was driving at the time of the crimes. Defendant told Ratto he was evading the police because he had an

5

outstanding warrant. He said he initially stopped but accelerated again after five seconds, thinking this would increase his chances of getting away. He told Ratto he had sideswiped two cars and had been drinking that day. He stopped because his passenger (Hutcherson) was "freaking out" and asked him to stop. Ratto testified he had interacted with defendant before and thought it was out of character for defendant to be combative.

Civilian witness Brodie Beck was nearby and heard police officers yelling at defendant. Defendant started to run away, but then stopped. Beck watched defendant initially comply with the officers' demands to get down on the ground, but then reach into his pants, although the officers told him not to move. Defendant stood up and approached the officers, and the officers tried to handcuff him. He pulled away and elbowed the officers. He eventually went to the ground, but he was still squirming, so the officers began hitting his legs and arms. He continued squirming and resisting for a few minutes and then stopped; the officers were then able to handcuff him.

*Defense case at trial*

The defense called three civilian witnesses to testify at trial, as well as defendant and his passenger.

Paul Robinson testified that he saw an officer take defendant down and hold him in place while two other officers got on top of him. Robinson watched defendant's face and upper chest hit the ground. After seeing an officer hit defendant three times, Robinson began filming the incident until his phone ran out of memory.[3] Robinson testified that he saw three officers wrestling with defendant, isolating his arms and trying to put handcuffs on him. Defendant was kicking, but "not directly at [the] officers." Before defendant's arm was isolated, one of the officers began hitting defendant with a

---

[3] The jury was shown Robinson's video by the prosecution during Officer Ditty's testimony. Ditty answered questions about the events shown on the video but testified that the recording was not an accurate depiction of the evening's events because it was "such a small glimpse of what happened." Officer Rockwell also testified the video was an incomplete representation of the event, and did not show the portion of the confrontation where defendant actively resisted.

baton, swinging with both hands. Robinson saw an officer hit defendant 12 to 15 times, although the phone did not record all of the hits. Defendant was "out of sorts" and yelling throughout the incident; he also moaned and sounded like he was in pain.

Sean Bowker also observed the incident. He testified that he watched police point their guns at a parked car and then after a few minutes viewed the police hitting defendant as he screamed, "Show me a badge." Bowker saw defendant lying on the ground, with multiple officers hitting and kicking him. Defendant was screaming, and one officer hit him 15 times with a baton. It sounded to Bowker as if the officers hit defendant very hard. The officers told defendant to stop resisting. Defendant's hands were behind his back, and his face was "being dug into the pavement." Bowker did not see defendant kick, punch, or grab onto any officer. It seemed as though the officers were "just beating him up."

Connor Solomon testified that he saw defendant being tackled by one officer, with "several" other officers jumping on top. They hit the ground with "some force." Solomon saw an officer hit defendant forcefully with a baton 20 times. Defendant was completely pinned down and unable to kick the officers. Solomon testified defendant was on his stomach the entire time and never grabbed an officer.

Hutcherson testified that he watched as defendant lay on the ground while the officers "plowed him." Defendant put both his hands in motion, to let them know his hands were behind his back. Defendant did not throw any punches or kick the officers. Hutcherson watched the police beat defendant with a nightstick; they yelled at defendant to stop resisting, and he yelled that he was not.

Defendant testified that, on the day of the incident, Hutcherson had been helping him move furniture. Defendant drove, despite having drank alcohol. He panicked and revved the engine when he saw police at a stop sign. The police car's lights came on, and defendant eventually pulled over. He momentarily complied with the officer's instructions to place his hands outside the window, but then made "another bad choice" and drove away. He had an outstanding warrant, and he did not want to return to jail. While fleeing the police, he ran a stop sign and hit a car. He eventually stopped, realizing

he was "in a lot of trouble." He immediately got out of the Suburban, put his hands up, lay down on the ground, and put out his arms and feet. The officer got out of his car and instructed him not to move. After a few moments where nothing happened, he stood up. He heard the officer issue a command, and turned toward the officer. He lifted his shirt, to show the officer he did not have any weapons. He "did pull out [his] wallet" because it contained his lawyer's card. He complied with the officer's request to get down, and the officer threatened to shoot him if he moved. The next thing he remembered was being knocked out. When he came to, multiple officers were beating him. He felt "a lot" of hitting "all over" his body and lost consciousness multiple times. The officers also choked him.

Defendant testified he suffered severe head trauma as a result of the incident. He did not remember being put into the police van or going to the hospital. He also did not remember the events recorded on video at the hospital. He testified he told Ratto he was on pain medication during his interview and was not thinking clearly. He was remorseful about the incident, but did not fight with the police. He was trying to give up when the police tackled and beat him.

*Pretrial pleas*

On April 18, 2016, defendant pleaded guilty to three of the six charges brought against him as a result of the events of February 18, 2015. He pleaded to driving under the influence (DUI) of alcohol (Veh. Code, § 23152, subd. (a); count 2), driving with a blood-alcohol level above 0.08 percent (*id*., § 23152, subd. (b); count 3), and DUI of a drug (*id*., § 23152, subd. (f); count 4), all within 10 years of three prior DUI convictions (*id*., § 23550). Defendant also admitted the three DUI priors and an on-bail enhancement. (Pen. Code, § 12022.1.) Trial began that same day on the three remaining counts: evading a police officer while driving recklessly (count 1); misdemeanor hit and run resulting in property damage (count 6); and felony resisting (count 5), the subject of this appeal.

8

*Pretrial motion and renewed motion to introduce expert testimony*

Prior to trial, defendant sought to introduce expert testimony from J. Greg Lewis concerning use of force by police and the People sought to preclude such testimony. Defendant proffered that Lewis had 22 years of experience as an active duty peace officer, had investigated "numerous incidents involving alleged officer misconduct," and had "received advanced training in the proper use of force by peace officers." Lewis was "prepared to testify, based on the reports of the involved officers and his observations from the video, that some of the force used by [Officers Ditty and Rockwell] was in his opinion not warranted by the circumstances presented to those officers at the time." Defendant argued Lewis's testimony would assist the jurors in determining whether the officers used excessive force, because the jurors would not have experience with collapsible batons or specialized submission holds. The written proffer did not provide additional specifics as to what Lewis would discuss and opine on; nor did the defense provide further details at oral argument on the motion. The People argued expert testimony was unnecessary and "in most cases not acceptable," and that it would unnecessarily delay the trial and confuse the jury.

The trial court ordered the expert testimony excluded. Reasoning there would be multiple witnesses testifying as to what happened during the incident, the court found the jury possessed the necessary common knowledge to determine whether the use of force was reasonable. The court expressed concern that an expert opinion would "invade the province of the jury on the relevant issue of reasonableness of the use of force."[4] The court added that the probative value of any expert opinion evidence would be outweighed by the risk of jury confusion and delay. The court instructed the parties that any witnesses, including police witnesses for the prosecution, would be prohibited from expressing opinions about the reasonableness of the officer's conduct.

---

[4] As we explain in Part II, *post*, this was not a valid reason for excluding the expert testimony in this case.

9

After the People had presented their case, defendant moved the trial court to reconsider its order excluding his expert. Defendant argued the officers had testified about their reasons for using force, and his right to a fair trial would be violated if he were unable to respond in kind with expert testimony. In support of his motion, defendant filed copies of the partial transcripts of the trial testimony of Officers Ditty, Rockwell, and Kozak. Defendant also filed a copy of an investigative report prepared by Lewis that reviewed the legal definition of use of force, summarized the officers' reports, and described the video from the incident. In the report, Lewis opined that Ditty and Rockwell's "use of hands and attempted control holds, initially, were reasonable in attempting to detain [defendant]." Lewis also opined that Ditty's initial baton strikes to defendant's lower legs "would also be reasonable based on his observations and concerns . . . . [¶] However, upon realizing the strikes to [defendant's] legs were 'ineffective' he continued to strike [defendant] with the baton." In addition, Lewis opined Ditty struck in the area of defendant's lower back and buttocks, which was "dangerous" and risked injuring defendant. Lewis concluded that the extent of defendant's resistance "would not warrant strikes to these areas."

The trial court denied defendant's motion, noting that: "No opinion testimony came in" as well as finding "that the testimony of [the defense expert] would invade or interfere with the jury and [its] ability to find reasonable [*sic*]." The court added that the testimony "would address an ultimate issue in this case."[5]

On April 29, 2016, the jury found defendant guilty of all three remaining counts. In June, the trial court sentenced him on the instant case as well as the FTA and gun cases. The court sentenced defendant to state prison as follows: in the trial case: three years for count 1 (Veh. Code, § 2800.2), eight months (one-third the midterm) consecutive for count 2 (*id.,* §§ 23152, subd. (a), 23550), eight months (one-third the midterm) consecutive for count 5 (Pen. Code, § 69), six months concurrent for count 6

---

[5] As we explain in Part II, *post*, this was not a valid reason for excluding the expert testimony.

10

(Veh. Code, § 20002, a misdemeanor), and two years for the on-bail enhancement (Pen. Code, § 12022.1). The court stayed punishment for counts 3 (Veh. Code, §§ 23152, subd. (b), 23550) and 4 (*id.,* §§ 23152, subd. (f), 23550), pursuant to Penal Code section 654, without first imposing sentence.

In the gun case, defendant received eight months (one-third the midterm) (§ 29800, subd. (a)(1)), and in the FTA case he received eight months (one-third the midterm) (§ 1320, subd. (b)) and a stayed sentence for the on-bail enhancement (§ 12022.1). The trial court also imposed various fines and fees, incorporating by reference a number of fines and fees recommended in the presentence report, including (as relevant here) a $200 fine pursuant to section 672 on counts 1, 5, and 6 in the trial case as well as the FTA and gun cases. Defendant timely appealed.[6]

## DISCUSSION

### I

### *Sufficiency of the Evidence Supporting Count 5*

Defendant first challenges his conviction for resisting (§ 69; count 5), contending there is insufficient evidence Officer Ditty was engaged in the lawful performance of duties when he detained and arrested defendant. He argues that Ditty used unreasonable and excessive force in detaining and arresting him; thus, the officers' performance of their duties was not lawful.

A. *Section 69: Elements and Requirements*

Section 69 states: "Every person who attempts, by means of any threat or violence, to deter or prevent an executive officer from performing any duty imposed upon such officer by law, or who knowingly resists, by the use of force or violence, such officer, in the performance of his duty, is" guilty. The section "sets forth two separate

---

**6** Although defendant did not include the gun and FTA cases (Nos. CM041189 and CM042429) in his notice of appeal, they are included in the abstract. The FTA case was assigned an unauthorized fine, as we explain *post*. Thus, we exercise our discretion to liberally construe the notice of appeal to include the FTA case.

11

ways in which an offense can be committed. The first is attempting by threats or violence to deter or prevent an officer from performing a duty imposed by law; the second is resisting by force or violence an officer in the performance of his or her duty. [Citation.]" (*In re Manuel G.* (1997) 16 Cal.4th 805, 814.) Here, it is clear that defendant was charged with resisting (the second way). This crime requires the officer(s) to act "lawfully" at the time defendant resisted those same officers by use of force or violence. (*People v. Smith* (2013) 57 Cal.4th 232, 241 ["The second way of violating section 69 expressly requires that the defendant resist the officer 'by the use of force or violence,' and it further requires that the officer was acting lawfully at the time of the offense"].)

When excessive force is used in making what otherwise is a lawful arrest, the arrest becomes unlawful. (*People v. White* (1980) 101 Cal.App.3d 161, 164, 167.) Claims that an officer used an excessive amount of force during an arrest or seizure are analyzed under the "reasonableness" standard of the Fourth Amendment. (*Graham v. Connor* (1989) 490 U.S. 386, 395 [104 L.Ed.2d 443]; *Thompson v. County of Los Angeles* (2006) 142 Cal.App.4th 154, 164 [analysis properly under objective reasonableness standard].) Whether an officer acted reasonably in a particular use of force to effect a seizure "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." (*Graham,* at p. 396; see *Brown v. Ransweiler* (2009) 171 Cal.App.4th 516, 527.) The test of reasonableness under the Fourth Amendment "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." (*Graham,* at p. 396.) "In calculating whether the amount of force was excessive, a trier of fact must recognize that peace officers are often forced to make split-second judgments, in tense circumstances, concerning the amount of force required." (*Brown,* at p. 528.)

Whether a police officer has used reasonable force in detaining or arresting a defendant is "a pure question of fact . . . . [Citation.] Consequently, we only need

determine if there is sufficient evidence in the record such that a reasonable trier of fact could conclude that the force used in this case was reasonable. [Citation.] We may not reweigh the facts or substitute our judgment for that of the trial court." (*People v. Delahoussaye* (1989) 213 Cal.App.3d 1, 8.) We review the jury's determination in the light most favorable to the verdict. (*People v. Massie* (2006) 142 Cal.App.4th 365, 371.)

B. *Analysis*

Defendant argues Ditty hit him with the baton without need, as he was already on the ground with his hands behind his back when hit. He adds that Ditty never gave him time to obey the commands before continuing to hit him. But defendant does not recite the record in the light most favorable to the jury's verdict. When viewing the evidence with appropriate deference to the verdict, there is substantial evidence the officers took reasonably appropriate measures in response to defendant's failure to comply with the officers' commands and continued resistance to their attempts to handcuff him.

Defendant does not dispute the legality of the traffic stop; the undisputed evidence at trial showed his failure to yield, renewed attempts to escape the officers, and his non-compliance with their commands. Defendant's only argument of unlawful action by the police is their resorting to baton strikes. But there is ample evidence to support the conclusion that the officers resorted to baton strikes only after defendant disregarded their repeated demands to get on the ground, stop moving, and show his hands. As we have described *ante*, all three officers testified that defendant continued to resist vigorously, including grabbing Officer Ditty by the armpit, ripping off his shirt pocket flap, and snatching at his radio. He was yelling and screaming, as the video recording shows. Defendant also kept his hands in his waistband, as if to grab something, and the jury heard testimony from Ditty and Rockwell that suspects with firearms often keep them in their waistband or pocket area. Ditty, Kozak, and Rockwell all testified they felt threatened throughout the encounter and responded accordingly to minimize the danger and subdue defendant. The jury was entitled to believe the officers. (See *People v. White, supra,* 101 Cal.App.3d at p. 168 [whether officers used excessive force is a question for the jury].)

13

In sum, there is substantial evidence to support the jury's finding that the police were acting lawfully, and did not use excessive force by resorting to baton strikes when other methods did not work to secure defendant's compliance and arrest.

## II

### *Expert Testimony*

Defendant contends the trial court erred in refusing to allow him to introduce expert testimony on the reasonable use of force. We agree the court's rationale for excluding this evidence was unsound, and the court erred in excluding the testimony.[7] However, defendant has not shown prejudice.

Both before trial and after the People rested, defendant tried to introduce testimony of use-of-force expert Lewis. The mid-trial offer of proof included the expert's detailed written report, setting forth a second-by-second analysis of the video and concluding (based on the video, the police reports, and his 22 years as a peace officer who had investigated claims of police misconduct) that some of the force used was unwarranted. The trial court excluded the evidence because it would "invade the province of the jury" and addressed an "ultimate issue" in the case. The pretrial ruling also referred to Evidence Code section 352, but that reference was clearly driven by the trial court's view that the evidence was not necessary.

It is often said that we review for abuse of discretion a trial court's ruling on the admissibility of evidence, including expert testimony. (See, e.g., *People v. Brown* (2016) 245 Cal.App.4th 140, 156.) However, we have explained before that a trial court does not have discretion to depart from the legal standards governing an issue submitted for decision. (See, e.g., *County of Yolo v. Garcia* (1993) 20 Cal.App.4th 1771, 1778; *City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1297-1298.)

---

[7] The Attorney General does not argue that a ground not articulated by the trial court supports the ruling (cf. *Schabarum v. California Legislature* (1998) 60 Cal.App.4th 1205, 1216-1217) and we see no such ground.

14

Here we observe that two of the main cases involving use-of-force experts--discussed *post*--addressed the admissibility of *prosecution* experts, not *defense* experts. There is a difference in the analysis relevant here. "Evidence Code section 352 must bow to the due process right of a defendant to a fair trial and his right to present all relevant evidence of significant probative value to his defense. [Citations.]" (*People v. Burrell-Hart* (1987) 192 Cal.App.3d 593, 599.) The "trial court's discretion should 'favor the defendant in cases of doubt' [citation.]" (*Id*. at p. 600; see *People v. Mizer* (1961) 195 Cal.App.2d 261, 269 ["We believe that it is fundamental in our system of jurisprudence that all of a defendant's pertinent evidence should be considered by the trier of fact"].) But of course, the rule generally tilting discretionary evidentiary calls in favor of a criminal defendant neither changes the definition of relevance nor alters other rules of admissibility. (See *People v. Cornejo* (2016) 3 Cal.App.5th 36, 58-59.)

Generally, a qualified expert may testify on matters "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).) The trial court was wrong to exclude the proffered testimony because it "invaded the province of the jury" or involved "an ultimate issue." (See Evid. Code, § 805 [expert evidence is not inadmissible simply because it embraces the ultimate issue in the case].)

In a *civil* case where the plaintiff did not introduce expert testimony, we explained that expert testimony is not always *needed* to show excessive force. (See *Allgoewer v. City of Tracy* (2012) 207 Cal.App.4th 755, 764-766 [reversing nonsuit] (*Allgoewer*).) Endorsing the holding of a sister-state case, we explained that it does not take expert testimony to evaluate whether " 'smashing an arrestee's face to the ground' " was reasonable, but we also explained that some cases might present " 'subtleties of police procedure and practice . . . so far removed from the comprehension of a lay jury as to necessitate an expert.' " (*Id*. at p. 765, quoting *Robinson v. City of West Allis* (2000) 239 Wis.2d 595, 613 [619 N.W.2d 692, 700-701].) Endorsing the holding of a federal case, we explained: " 'Where force is reduced to its most primitive form—the bare hands—expert testimony might not be helpful. Add handcuffs, a gun, a slapjack, mace, or some

15

other tool, and the jury may start to ask itself: what is mace? what is an officer's training on using a gun? how much damage can a slapjack do? Answering these questions may often be assisted by expert testimony.' [Citation.] The court went on to conclude that the plaintiff's experts should have been allowed to testify about '[h]ow to train and use a police dog' and about 'the prevailing standard of conduct of the use of slapjacks.' " (*Id.* at p. 763, quoting *Kopf v. Skyrm* (4th Cir. 1993) 993 F.2d 374, 378-379.)

A criminal defendant's right to present his defense shows there will be cases where a defense expert's testimony should be admitted regardless of whether it is *necessary*. (See *People v. Burrell-Hart*, *supra*, 192 Cal.App.3d at pp. 599-600.) After all, a defendant need only raise a reasonable doubt whether the officers' actions were lawful to obtain an acquittal on a resisting charge.[8]

*Brown* and *People v. Sibrian* (2016) 3 Cal.App.5th 127 applied our reasoning in *Allgoewer* to criminal cases. *Brown* involved expert testimony introduced by the prosecution to the effect that the officers in that case adhered to their training; *Brown* agreed with the defense claim that it was error to admit such testimony because it was "an invitation to avoid the question of excessive force altogether by conflating it with whether the officers did as they were trained to do." (*People v. Brown*, *supra*, 245 Cal.App.4th at p. 169.) In contrast, *Sibrian* held a prosecution expert properly testified about an officer's need to escalate force when confronted with a noncompliant person and about "the potential continued danger posed by a suspect after he has been wrestled to the ground" and "the risks of allowing a noncompliant suspect to remain in his car and why the officers may have decided not to use a chemical agent." (*Sibrian*, at p. 134.) These points may have been helpful to the jury, as matters beyond the common understanding of lay persons. (*Id.* at pp. 134-135.)

_____

**8** In fact, a defendant need only raise a reasonable doubt in the mind of *one juror* to either escape liability or put the People to the burden of retrying the case, a more favorable outcome than a conviction. (See *People v. Soojian* (2010) 190 Cal.App.4th 491, 521.)

16

Defendant was struck repeatedly by batons after he was on the ground. He wanted the expert to explain to the jury some " 'subtleties of police procedure and practice' " (*Allgoewer*, *supra*, 207 Cal.App.4th at p. 765), specifically, the proper use (and *non*-use) of batons and the niceties of the proper application of escalating force on a noncompliant person.[9] He wanted to bolster the view that his act of initial resisting alone did not give multiple officers free rein to strike him repeatedly with batons. If the officers could have restrained him through lesser means known to them based on their training and the facts as they reasonably perceived them, he might establish unreasonable force was used and, hence, establish a defense to a charge of resisting or deterring an executive officer.

The expert's report in this case shows that he was prepared to testify in part as follows: Although defendant presented a legitimate safety concern and was not secured even after Rockwell arrived, and Ditty's initial actions--including the early baton strikes-- were justified by the perceived danger, Ditty continued to strike defendant after realizing the strikes were ineffective. Rockwell's (alleged) chokehold on defendant "was clearly an improper application of the carotid restraint" and risked serious injury or death. Even after defendant stopped resisting, Ditty continued to strike him with the baton in the lower torso and the lower back and buttocks area, but these areas should be avoided when using an impact weapon because they were "highly dangerous" areas to hit because of the risk to "vital areas such as the kidneys, spine, and tailbone." "The extent of [defendant's] perceived resistance would not warrant strikes to these areas." The point of inflicting pain is to achieve compliance, but where a suspect is still noncompliant after infliction of pain an officer must reassess and consider using other techniques, such as a Taser; spray

---

[9] The pretrial offer of proof was that the expert would testify about use of collapsible batons and "submission holds" on a person already on the ground. The prosecutor, overstating the holding of the *Brown* case, argued in her in limine motion that no expert (or lay) evidence about excessive force was admissible. At the pretrial hearing, she argued this case did not involve special weapons, only hands and batons, and the jurors could understand the proper use of those weapons. Defense counsel argued that a baton was a special tool, special holds were used, and the question was not whether expert testimony was necessary, but whether it would be helpful.

17

would not have been a good choice in this case because of the risk of overspray (due to the close-quarter struggle).

This is the kind of testimony we indicated in *Allgoewer* would be appropriate, and nothing in *Brown* or *Sibrian* holds otherwise. The prosecutor's repeated view that *Brown* barred such evidence was simply wrong, as is the Attorney General's similar view, expressed as an alternative defense of the trial court's ruling.

Because the trial court's mistaken view about "ultimate issue" testimony drove its Evidence Code section 352 analysis, that analysis, too, was mistaken. Defendant's expert evidence should have been admitted.

However, defendant fails to offer an adequate claim of prejudice. The prejudice argument in his opening brief--bereft of a separate heading--is as follows:

> "[T]the jury would have benefited from testimony from an expert as to how such a tool is properly used. As a result, the trial court's denial of appellant's request to present an expert on the use of force therefore violated appellant's right to present his defense theory to the jury, thus violating his Fourteenth Amendment due process right to a fair trial."

Defendant offers no analysis or authority for the proposition that exclusion of *any* evidence that benefits a criminal defendant violates the Fourteenth Amendment or the due process clause. The Attorney General heads a "No Prejudice" argument pointing out that the jury heard testimony from all the officers, defendant, defendant's passenger, and from the bystanders, and saw video that captured part of the struggle. In his reply brief, defendant cites authority for the correct proposition that ordinarily, the improper exclusion of evidence not amounting to a complete deprivation of a defense is measured under the state law standard of prejudice set forth in *People v. Watson* (1956) 56 Cal.2d 818, 836. (See *People v. Jones* (2013) 57 Cal.4th 899, 957; *People v. Sotelo-Urena* (2016) 4 Cal.App.5th 732, 756 [rule applied to expert defense evidence].) But even in the reply brief defendant fails to *explain* how the assumed error caused prejudice, he merely argues the jury "would have benefited" from the excluded testimony.

It is an appellant's duty to spell out in the briefing exactly how a claimed error caused prejudice; put another way, we do not presume prejudice. Accordingly, the

18

failure to explain with particularity how a claimed error caused prejudice forfeits the claim. (See *People v. Nero* (2010) 181 Cal.App.4th 504, 510, fn. 11; *People v. Mitchell* (2008) 164 Cal.App.4th 442, 467; see also *People v. Roscoe* (2008) 169 Cal.App.4th 829, 840 [failure to properly head and argue a point].)

We note that in closing arguments the parties focused appropriately on the evidence of what the officers did and why. Although the expert testimony might have provided greater detail about the *appropriateness* of the use of the batons and alleged holds during various points in the encounter, the jury could see for itself from the video evidence where defendant was hit and held and how many times. Although we adhere to our view in *Allgoewer* that in some cases expert testimony may be helpful to a jury's understanding of the use of special weapons and tactics, this was not the kind of case where such evidence, although potentially helpful, was likely to make any significant difference to the outcome.

Here the jury's verdict was well-supported by defendant's earlier physical resistance before any force deemed excessive by defendant's expert was employed. The expert opined that the initial baton strikes were justified. Sufficient resisting had already taken place by this point to support the conviction. According to the expert, it was force used later in the encounter that was excessive. Although the expert's testimony established that defendant would have been potentially justified in resisting the later excessive force, it did not help to justify his resistance of the earlier force that his own expert opined was appropriate. (See *People v. Williams* (2018) __ Cal.App.5th __, 2018 Cal.App.Lexis 713, at pp. *9-*11 [a defendant may be properly convicted of violating section 148(a)(1) even if the officer uses excessive force subsequent to the completed violation].) Further, this case turned on what was largely a credibility contest between the officers and the bystander-witnesses about when defendant was hit and whether he was still resisting when certain of the baton strikes were administered. In our view, defendant received a fair adjudication on the question whether the officers acted with excessive force (as he argued) or reasonable force (as the jury found).

19

## III

### *Sentencing Errors*

We note several errors in sentencing that require remand.

First, the trial court failed to impose sentence on counts 3 and 4 before staying execution pursuant to section 654. If a trial court determines section 654 applies, it must impose sentence and stay execution on every affected count. (*People v. Alford* (2010) 180 Cal.App.4th 1463, 1467, 1469.) We shall remand for the trial court to sentence on those counts.

Second, we have found unauthorized fines imposed pursuant to section 672 on counts 1, 5, and 6--the trial verdicts--and in the FTA case. Section 672 provides in relevant part: "Upon a conviction for any crime punishable by imprisonment in any jail or prison, *in relation to which no fine is herein prescribed*, the court may impose a fine on the offender . . . ." (Italics added.)

"The operative language of section 672 is the second phrase of the first sentence, 'in relation to which no fine is herein prescribed.' " (*People v. Breazell* (2002) 104 Cal.App.4th 298, 302.) "The language used in section 672 demonstrates that it was meant to provide a fine for offenses for which another statute did not impose a fine. In other words, this is a catchall provision allowing a fine to be imposed for every crime, even if the statute criminalizing the conduct did not specifically authorize a fine. The limiting provision was meant to ensure that a fine pursuant to section 672 would not be imposed if another statute authorized a fine for the offense." (*Breazell,* at p. 304.)

A separate fine for defendant's offense was authorized by the statutes of conviction on all four counts specified *ante*. The imposition of fines on those counts pursuant to section 672 was unauthorized and must be stricken. (*People v. Breazell, supra*, 104 Cal.App.4th at p. 305.) We have previously corrected or stricken multiple unauthorized fines purportedly imposed pursuant to section 672 in Butte County; we note that the probation report also contained the incorrect recommendation. Accordingly, we shall remand for the trial court to resentence on all fines and fees on the four counts.

20

Finally, we note that the abstract reflects conviction dates for counts 1 and 5 that are unsupported by the record. On remand, the abstract should be reviewed and corrected.

## DISPOSITION

The sentence is vacated. The matter is remanded to the trial court to exercise its discretion in resentencing in accordance with this opinion. The trial court clerk is then directed to prepare a new abstract of judgment and to forward a certified copy of the same to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.


        /s/
        Duarte, J.


We concur:


    /s/
Butz, Acting P. J.


    /s/
Murray, J.


21