Filed 12/15/20  P. v. Kittles CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DESHUN A. KITTLES,<br><br>    Defendant and Appellant. | A154955<br><br>(San Francisco City & County<br> Super. Ct. No. SCN226942) |

BY THE COURT:

It is ordered that the opinion filed herein on December 10, 2020, be modified as follows:

1. In the caption, defendant and appellant's name be modified to read "Deshun A. Kittles."

2. On page one, first line be modified to read: "Defendant Deshun A. Kittles was convicted of attempted murder and related offenses."

There is no change in the judgment.

Dated:

_____
Humes, P. J.

1

Filed 12/10/20  P. v. Kittles CA1/1 (unmodified opinion)

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIRST APPELLATE DISTRICT

### DIVISION ONE

THE PEOPLE,

      Plaintiff and Respondent,

v.

DESHAUN A. KITTLES,

      Defendant and Appellant.

A154955

(San Francisco City & County
 Super. Ct. No. SCN226942)

Defendant Deshaun A. Kittles was convicted of attempted murder and related offenses.  He asserts the trial court erred in two respects—excluding evidence of the "violent character" of an individual at the scene of the shooting, whose threatening actions, he claims, provoked the shooting of the victim in misdirected self-defense, and excluding expert testimony on the "flight or fight reaction."  Defendant additionally maintains, and the Attorney General agrees, the case must be remanded to allow the trial court to exercise its discretion to strike a prior conviction, as well as to correct the abstract of judgment.  We agree as to these latter points, and remand for those purposes. In all other respects, we affirm.

1

# BACKGROUND

Defendant testified in his own defense about the shooting of R.T. in the Potrero Hill neighborhood of San Francisco. In November 2017, he drove to Potrero Hill, where he had lived until he was 16 years old. He had a handgun with him, a Glock 9 mm, which he knew he was legally prohibited from possessing due to a prior felony conviction. He bought the gun because he had been threatened in the past.

Defendant's uncle joined him, and the pair went searching for drugs for his uncle. When they were unable to find any, they stopped and bought alcohol, then continued to another location, where his uncle continued his quest for drugs. Defendant did not accompany his uncle, but decided to visit a female friend, S., who lived nearby.

He went to the residence where he thought S. lived, but it was actually another person's home. Nevertheless, S. was there, and, according to defendant, S. told him to "meet her out back."

Defendant went outside to talk with S., and "two dudes" were there. One of them was leaning against a railing, and "the bigger one," later identified as B.K., said something to defendant which he could not recall, but was "intimidating."[1] The man asked "why you talkin' to my cousin," and "in that instant [the man] pulled out a gun and kind of advanced toward [defendant]." According to defendant, "that's when I went in my pocket and I pointed the gun at this dude advancing towards me with a gun, and I shot. I didn't aim to kill this person. . . . I shot out of fear for my life. I shot because I thought I was going to lose my life in that instant."

---

[1] The "bigger" man, B.K., was about six feet tall and weighed "closer to 300 pounds" than 200 pounds. The smaller man, R.T., was five feet, five inches tall and was "very thin," weighing about 120 pounds. Neither man testified at trial. Nor did S., after efforts to locate her were unsuccessful.

2

San Francisco Police Officer Martinez was dispatched with other officers to the area around 2:50 p.m., after the "ShotSpotter" system detected four gunshots. When Martinez arrived, he saw a man lying on the ground "moaning in pain." The victim had several gunshot wounds, in his stomach, hip and arm, and was bleeding. Later identified as R.T., the victim told the officer he "was by the stairs and he got shot" by a "black man."

One of the responding officers noticed a residence with an open door and blood on the floor. B.K., his brother, and his father lived there. An officer "attempted to obtain a statement" from B.K., but "he really did not want to speak to [him]." B.K. was taken into custody on an outstanding warrant.

B.K.'s father gave officers permission to search the residence. No weapons were found.

Other officers, including Officer Thompson, also responded to the scene and encountered a car speeding down the wrong side of the street near the shooting. They pulled over the car, which defendant, wearing an Oakland Raiders beanie, was driving.

Thompson could not see defendant's right hand, and he asked defendant to step out of the vehicle. Defendant refused, so the officer pulled him out. Defendant's right arm "came from underneath his jacket," and the officer saw "he was holding a black firearm in his hand that was at this point kind of directly pointed at me." The firearm, a Glock handgun, fell out of defendant's hand. Defendant tried to grab it, and the two were "in a tussle both trying to get the gun." Defendant managed to grab it, so Officer Thompson "delivered like one punch to his head . . . and he let go of the gun at that point." Defendant was arrested.

A neighbor of S.'s testified that on the day of the shooting, she glanced outside and saw a "black man . . . [wearing] a black beanie with white writing on it" and a black jacket. He walked past the neighbor's window carrying what looked like a "black pipe" in his right hand. As he passed, the neighbor heard "a female voice saying, 'Don't shoot me. Don't shoot me.' " Then she saw S. "running up the stairs. She got up the stairs and then she slipped; she fell. Then she went into her father-in-law's place," which was in the next building. After S. ran into the building, the neighbor heard "two or three gunshots."

After she heard the gunshots, she saw the man with the beanie walk up the stairs and stop "in front of where [S.] had ran inside." The man "put his hand up and he shot like two or three times like in the door."

Security camera footage from the neighborhood on the day of the shooting showed defendant park his car and walk into the house where S. was. At 2:48 p.m., the door to that residence was closed and defendant was inside for under a minute. Defendant then walked out of the unit toward the balcony. At 2:50 p.m., the recording shows defendant proceeding up the stairs with his right arm out and a black object in his hand.

A conversation between defendant and his sister when he was in jail was recorded. His sister asked, "So you were just so drunk brother, just trippin?" Defendant responded "No, no–that's wasn't–No, no, no, the times when I did what I did, I was in, I was. . . ." His sister responded: "Well they said it didn't look like it. They was like, you just. . . ." Defendant answered: "Who look like they in their right mind when they're trying to kill somebody. . . . Who look like they in they right mind-when they try to do something like that?" Defendant testified he was referring to B.K., not himself.

4

A coordinator with the San Francisco Street Violence Intervention Program, which focuses on the housing projects in San Francisco, testified regarding violence in the Potrero Hill housing projects and the reaction or belief system it causes in many residents. The coordinator explained there is "a lot of gun violence" in the projects, specifically Potrero Hill. "[B]ased off the things that has happened in those communities from the crack epidemic until now, it causes a lot of young people in those communities to carry weapons . . . based [on] fear, off of a bunch of different dynamics that's happening." In his experience, people in that community in their 30's and 40's also "might carry a gun based out of fear," even though "they may not want to use the gun." "[I]n the community we notice that there has been a large issue around Post Traumatic Stress Syndrome and all other issues."

The coordinator further testified he had heard the phrase " 'I'd rather be judged by 12 than carried by six,' " explaining this meant "I [would] rather be judged by 12 jurors than carried by a bunch of pallbearers burying me." He explained the thinking of community members as "if I'm afraid that fear can create a defense based off of I'm believing that you're the opposition or based off of the fear . . . [¶] . . . [¶] . . . so, like, if I have the certain fear and I see someone and I know that there is a possibility that this person might be coming to harm me, I don't want to do anything but now I have to jump on defense because I don't want to die." In his experience, community members "feel the need to carry a gun out of fear," but are not "walking around carrying the gun because they want to initiate a criminal activity or some criminal act."

The coordinator also testified he knew that B.K. was a "system involved" client of the Street Violence Intervention Program. This meant he

was on probation or parole, and either had been a victim or perpetrator of a violent crime.

The San Francisco District Attorney charged defendant with attempted premeditated murder (Pen. Code, § 187, subd. (a), count 1),[2] assault with a firearm (§ 245, subd. (b), count 2), discharging a firearm in a grossly negligent manner (§ 246.3, subd. (a), count 3), possession of a firearm after being convicted of a felony (§ 29800, subd. (a)(1), count 4), possession of a firearm after being convicted of a violent felony (§ 29900, subd. (a)(1), count 5), and resisting a peace officer (§ 148, subd. (a)(1), count 6). As to enhancing allegations, the district attorney alleged personal discharge of a firearm causing great bodily injury (§ 12022.53, subd. (d), count 1), personal use of a firearm and personally inflicting great bodily injury (§12022.5, subd. (a), 12022.7, subd. (a), counts 1, 2, 3), prior serious felony strike (§ 667, subds. (d), (e)), and prior prison terms for possession of a firearm by a felon and robbery (§ 667.5, subd. (b)). Count 4 and the prior prison term allegations were subsequently dismissed. The firearm enhancement as to count 3 was not submitted to the jury.

The jury found the attempted murder was not willful, deliberate, or premeditated, and found defendant guilty of the remaining counts and enhancement allegations true. The trial court sentenced defendant to a total prison term of 26 years (imposing the midterm of seven years for attempted murder, doubled based on his previous strike, plus seven years for the personal use of a firearm and great bodily injury enhancement under §§ 12022.5, subd. (a) & 12022.7, subd. (a) and five years for the prior strike).

---

[2] All further undesignated statutory references in this section are to the Penal Code.

6

The court dismissed the section 12022.53, subdivision (d) finding and stayed or ran concurrently the sentences on the remaining counts and allegations.

## DISCUSSION

### *Exclusion of Character Evidence Regarding B.K.*

Defendant maintains the trial court erred in excluding evidence of "four incidents of violent acts" by B.K.[3] to support his claim the shooting was in self-defense. Although R.T. was the victim, not B.K.,[4] defendant claims evidence of B.K.'s "violent character" was relevant to prove "he behaved in such a manner on this occasion" and was therefore admissible under Evidence Code section 1103. He also urges the exclusion of this evidence violated his due process rights under the federal Constitution.

Generally, "evidence of a person's character or a trait of his or her character . . .[including] evidence of specific instances of his or her conduct . . . is inadmissible when offered to prove his or her conduct on a specified occasion." (Evid. Code, § 1101, subd. (a).) Evidence Code section 1101 provides an exception for admission of prior bad acts when relevant to prove a fact other than disposition. "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a

---

[3] These incidents were a 2008 misdemeanor assault conviction for throwing a rock at a group of girls, a 2010 robbery conviction, a 2016 parole violation for punching a woman he was dating, and a 2016 domestic violence conviction.

[4] "[T]he doctrine of transferred intent is available as a defense in California. . . . Thus, a defendant is guilty of no crime if his legitimate act in self-defense results in the inadvertent death of an innocent bystander." (*People v. Levitt* (1984) 156 Cal.App.3d 500, 507, disapproved on another ground in *People v. Johnson* (2016) 62 Cal.4th 600, 649, fn. 6.)

7

defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act." (Evid. Code, § 1101, subd. (b).)

Evidence Code section 1103, subdivision (a)(1) also "provides an exception to Evidence Code section 1101, subdivision (a) when a defendant offers evidence regarding the character or trait of a victim 'to prove conduct of the victim in conformity with the character or trait of character.' " (*People v. Gutierrez* (2009) 45 Cal.4th 789, 827 (*Gutierrez*).) Evidence Code section 1103 provides in part: "In a criminal action, evidence of the character or a trait of character (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct) of the victim of the crime for which the defendant is being prosecuted is not made inadmissible by Section 1101 if the evidence is: (1) Offered by the defendant to prove conduct of the victim in conformity with the character or trait of character." (Evid. Code, § 1103, subd. (a)(1).)[5]

In excluding evidence of B.K.'s prior bad acts, the court stated at the first hearing on the issue: "I don't think [Evidence Code section] 1103 applies here. If you look at the plain meaning of the statute and plain language of the statute, it talks about the victim of a crime. He's not the victim here at all. . . . [I]f Mr. Kittles testifies–he might be relevant in terms of honest but reasonable belief or maybe honest and unreasonable belief and the need to defend. [¶] . . . [¶] If you start with the general prohibition on character

---

[5] Evidence of a victim's prior violence or reputation for dangerousness may also be relevant to a defendant's state of mind in claiming self-defense, but only if the defendant knew of the victim's prior violence or reputation. (See *People v. Tafoya* (2007) 42 Cal.4th 147, 165.) Defendant disclaims any reliance on this theory.

evidence under [Evidence Code section] 1101(a), I don't see how this comes in." The court also questioned the relevance of B.K.'s prior bad acts, noting "I just wonder about that, because you describe the 2008 misdemeanor assault conviction as involving throwing something at some kid. And then he's got a robbery that's five years before that doesn't involve, you know, the defendant. Then [B.K.] has some domestic violence conviction and parole violations for that. [¶] . . . [¶] What's the motive? I don't see it."

Following supplemental briefing, the court held another hearing on the issue. The prosecutor maintained the evidence was inadmissible under Evidence Code sections 1101, 1103, and 352. The court reiterated that Evidence Code section 1103 did not apply because B.K. was not a victim in the case. Noting that B.K.'s prior criminal acts "don't involve . . . the defendant . . . [or] any associates of the defendant," the court ruled the evidence was inadmissible under either Evidence Code section 1101 or section 1103. The court noted "If Mr. Kittles testifies I may be in a position where I have to reconsider my initial ruling, but as it stands right now, I just don't see any basis to admit that evidence under [Evidence Code sections] 1103 or 1101(a)." The court ruled "I am going to order that no reference be made to [B.K.'s] criminal history as outlined in the memorandum. If Mr. Kittles actually testifies I'll listen to what he says and if it becomes admissible under either [Evidence Code sections] 1103 or 1101(b) or for some other legitimate purpose, it may be relevant to let's say his state of mind, I'll reconsider it at that point."

Defendant continues to press his claim that evidence B.K. previously acted in an aggressive or violent manner should have been allowed as circumstantial evidence that he behaved in like manner at the time of the killing. Defendant recognizes that evidence of prior conduct to prove an

9

individual acted in the same manner on another occasion is generally inadmissible. (*People v. Erskine* (2019) 7 Cal.5th 279, 295 [" 'Evidence Code section 1101, subdivision (a) sets forth the " 'strongly entrenched' " rule that propensity evidence is not admissible to prove a defendant's conduct on a specific occasion.' "].[6]) He urges, however, that B.K. should be considered a "victim" under Evidence Code section 1103 and that we should not adopt the "cramped concept of 'victim' " urged by the Attorney General.[7]

Evidence Code section 1103 created an exception to the general prohibition against character evidence set forth in Evidence Code section 1101. (*Gutierrez, supra,* 45 Cal.4th at pp. 827–828.) " 'Where exceptions to a general rule are specified by statute, other exceptions are not to be implied or presumed' unless a contrary legislative intent is evident." (*People v. Standish* (2006) 38 Cal.4th 858, 870.)

Had the Legislature intended "victim" to mean not only the person injured by the criminal conduct, but also others in the vicinity of the crime, it could have included such definitional language. But it did not. (See *People v. Vargas* (2014) 59 Cal.4th 635, 648 [" ' "We must assume that the Legislature knew how to create an exception if it wished to do so." ' "].) We also note that for purposes of victim restitution, the statutory scheme defines "victim" to mean "an individual who sustains injury or death as a direct result of a crime. . . ." (Gov. Code, § 13951, subd. (g).)

---

[6] Although in the trial court defendant sought to introduce evidence of B.K.'s prior criminal acts under Evidence Code section 1101, subdivision (b), claiming it was evidence of motive or intent, he does not pursue this claim on appeal.

[7] In his reply brief, defendant, apparently mistakenly, relies on Evidence Code section 803 in claiming B.K. should be considered a victim. That section has no bearing on whether a bystander can be considered a "victim."

Nor has any court, over the years, suggested the term "victim" as used in Evidence Code section 1103 includes individuals who were not injured by the charged criminal conduct.

Defendant cites to *People v. Shoemaker* (1982) 135 Cal.App.3d 442 (*Shoemaker*), and "the multiple cases cited therein," to support his claim that admission of evidence of B.K.'s prior violent acts "should not turn on whether the aggressive actor is a named victim . . . but rather whether the actor is one who could have caused a reaction by the defendant." In *Shoemaker*, the defendant stabbed a sleeping man he found in bed with his girlfriend. (*Id*. at pp. 444–445.) At trial, the defendant testified he stabbed the victim in self-defense (*id*. at p. 445), and he sought to introduce evidence that the victim had "terrorized an elderly couple in their home and fired a shot at one of them" about two months *after* the stabbing. (*Ibid*.) The court noted previous decisions "relating to character evidence of violence have dealt with prior, rather than subsequent, acts of aggression by the alleged victim." (*Id*. at p. 447, italics omitted.) Quoting Wigmore, the court explained, " '[c]haracter at an earlier or later time than that of the deed in question is relevant only on the assumption that it was substantially unchanged in the meantime, i.e. the offer is really of character at one period to prove character at another. . . . [A] man's trait or disposition a month or a year after a certain date is as evidential of his trait on that date as his nature a month or a year before that date; because character is a more or less permanent quality and we may make inferences from it either forward or backward.' " (*Ibid*., italics omitted, quoting 1 Wigmore, Evidence (3d ed. 1940) § 60, p. 463 & 5 Wigmore, Evidence (Chadbourn rev. ed. 1974) § 1618, p. 595.) The court therefore concluded "evidence of the victim's subsequent acts of violence, when offered by the defendant in a criminal case, is relevant and admissible under

11

[Evidence Code] section 1103 to prove the victim's violent character at the time of the earlier crime." (*Shoemaker*, at p. 447.) In short, *Shoemaker* concerned evidence of the *stabbing victim's* violent character and was expansive only in that it held such evidence could include conduct occurring both before and after the charged offense.

Defendant also cites to the recent decision in *People v. DelRio* (2020) 54 Cal.App.5th 47. In that case, the defendant sought to introduce evidence of the *victim's* violent and aggressive nature to show that he (the defendant) drew and fired a gun only after the victim had drawn, racked, and aimed his gun at the defendant. (*Id.* at p. 50.) The trial court ruled the evidence would be allowed only if the defendant had been aware of the victim's character. (*Id.* at p. 55.) The Court of Appeal held this was error, explaining that for purposes of proving self-defense, whether the defendant was aware of the victim's propensity for violence is immaterial—such evidence " 'nevertheless tends to show that the victim was probably the aggressor.' " (*Ibid.*)

We understand defendant's theory—that in this particular case, where B.K. and the victim were standing next to one another, the defendant was assertedly as threatened by B.K. drawing a gun, as he would have been had the victim drawn a gun, and it was mere happenstance defendant's shot struck the victim, rather than B.K. But we have considerable difficulty seeing the reasonable bounds of such theory, nor were we aided in that regard by defendant at oral argument. We therefore leave it to the legislature to decide whether to depart from decades of established law.

### Expert Testimony on the "Fight or Flight" Reaction

Defendant additionally claims the trial court erred in excluding expert testimony on the "fight or flight reaction." (Capitalization omitted.) In his opening brief, he asserts the testimony of a psychologist about the fight or

flight response was relevant both to bolster his claim of self-defense by explaining the reasonableness of his actions and to demonstrate the response caused his failure to recall specifics about the incident on cross-examination. Defendant maintains the expert would have explained "that a person has gaps in memory in light of a traumatic situation," asserting the fight or flight reaction would explain defendant's repeated failure to recall specifics about the incident on cross-examination. In his reply brief, he further asserts the expert testimony was relevant to "whether he should have fired his own gun in self[-]defense or whether he should have run, even though the jury was instructed he was not required to have run."[8]

### *The Defense Motion*

Defendant filed a motion to allow the testimony of a psychologist, who had not examined defendant, "to explain to the jury the concept of the fear response," and its "neurobiological underpinnings and its impact on memory and rational thought process." Defendant maintained "The issue of the reasonableness of the use of force based on the threat is for the jury to decide, but relevant to that decision is how people respond to traumatic events and how the brain operates during those events. . . . [The psychologist] will assist the jury in understanding and evaluating the reasonableness of [defendant's] actions."

At the initial hearing on the motion, the court first observed the expert witness disclosure was untimely because it "did not occur 30 days before the trial." The court nevertheless addressed the substance of the motion. The court stated, "the jury is going to have to apply reasonableness standards . . .

---

[8] As the Attorney General noted, defendant's "proffer of the proposed testimony of psychologist [Dr.] Evered [*sic*] varied somewhat with each iteration."

using its common knowledge. And then the jury is going to have to decide whether force was appropriate under the circumstances or whether [defendant] overreacted. [¶] . . . [¶] The jury is also going to have to decide whether or not the [victim], or [B.K.], in fact, engaged in threatening conduct towards [defendant]. So the jury is going to have to decide, not some doctor who never examined [defendant], whether or not he had an honest belief in the need to defend himself, and was his stated belief reasonable in light of all the circumstances. And, lastly, whether the use of potentially deadly force was proportional to whatever he was being confronted with by [R.T.] and [B.K.]"

The court returned to the issue the following day, ruling "I'm simply not persuaded that the way the standards [have] been characterized that it's of some assistance and it's germane to . . . defendant's psyche or his mindset [or] his subjective beliefs and whether it's reasonable. I just don't think that this should be permitted under the rationale of the cases that I mentioned yesterday."

Defendant renewed his motion to have the psychologist testify following his testimony. His counsel asserted the expert would "explain why there were serious gaps in [defendant's] failures to recall these things, how the body and the mind responds to a traumatic situation such as the one [defendant] testified to in terms of being faced with an intimidating deadly threat and his response to it." The court denied the motion.

Expert testimony is admissible only if it is "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).) "The correct rule on the necessity of expert testimony has been summarized by Bob Dylan: 'You don't need a weatherman to know which way the wind blows.' The California

14

courts, although in harmony, express the rule somewhat less colorfully and hold expert testimony is not required where a question is 'resolvable by common knowledge.' " (*Jorgensen v. Beach 'N' Bay Realty, Inc.* (1981) 125 Cal.App.3d 155, 163.) Accordingly, expert opinion is not admissible, " 'if it consists of inferences and conclusions which can be drawn as easily and intelligently by the trier of facts as by the witness.' " (*People v. Sibrian* (2016) 3 Cal.App.5th 127, 133.)

Defendant relies on *People v. Reardon* (2018) 26 Cal.App.5th 727 (*Reardon*), in support of his assertion the trial court erred in excluding the testimony. In that case, the charge at issue was for felony resisting arrest. (*Id*. at p. 734.) Defendant sought to introduce expert testimony by a police officer as to his opinion that some of the force used by the arresting officers was not warranted. (*Id*. at pp. 735, 737.) "He wanted the expert to explain to the jury some ' "subtleties of police procedure and practice" ' [citation], specifically, the proper use (and nonuse) of batons and the niceties of the proper application of escalating force on a noncompliant person." (*Id*. at p. 739, italics omitted.) The trial court excluded the testimony, reasoning "there would be multiple witnesses testifying as to what happened during the incident, . . . [and] the jury possessed the necessary common knowledge to determine whether the use of force was reasonable." (*Id*. at p. 735.) The court "expressed concern that an expert opinion would 'invade the province of the jury on the relevant issue of reasonableness of the use of force,' " and held the "probative value of any expert opinion evidence would be outweighed by the risk of jury confusion and delay." (*Ibid*.) The Court of Appeal concluded the trial court had erred. Although the ruling was reviewed for abuse of discretion, the appellate court pointed out the " 'trial court's discretion should "favor the defendant in cases of doubt.' " " (*Id*. at pp. 736–737, quoting *People*

15

*v. Burrell-Hart* (1987) 192 Cal.App.3d 593, 600.)  This is because, " 'Evidence Code section 352 must bow to the due process right of a defendant to a fair trial and his right to present all relevant evidence of significant probative value to his defense.' " (*Reardon*, at p. 737.)

The Court of Appeal concluded, however, the defendant failed to demonstrate prejudice.  (*Reardon, supra*, 26 Cal.App.5th at p. 740.)  While "expert testimony might have provided greater detail about the appropriateness of the use of the batons and alleged holds . . . the jury could see for itself from the video evidence where defendant was hit and held and how many times." (*Id.* at p. 741, italics omitted.)  Thus, although the evidence was "potentially helpful," it was not "likely to make any significant difference to the outcome." (*Ibid.*)

*Reardon* does not aid defendant in any respect.  There the defendant sought to admit testimony regarding the reasonableness of certain police actions, a subject about which expert testimony might assist the jury.  Here, in contrast, defendant claimed the expert would "assist the jury in understanding and evaluating the reasonableness of [his own] actions," including "whether he should have fired his own gun in self[-]defense or whether he should have run." "Psychologists, psychiatrists or sociologists may have specialized empirical knowledge regarding the range of reactions to a given provocation, or the reaction of the statistically average individual in a given community.  But this information would not materially assist the jury in its task." (*People v. Czahara* (1988) 203 Cal.App.3d 1468, 1478.) "[P]sychiatric testimony on adequacy of provocation is inadmissible [because] . . . the adequacy of provocation is not a subject sufficiently beyond common experience that the opinion of an expert would assist the trier of fact. [Citation.]  Rather, the reasonableness of a reaction is left to the jurors

precisely so that they may bring their common experience and their own values to bear on the question of whether the provocation partially excused the violence.  To find the provocation adequate is to find that the defendant's behavior, while still reprehensible, is an understandable product of common human weakness, and therefore partly excusable." (*Ibid*.)

Defendant maintains the expert testimony was relevant to explain the fight or flight reaction caused his failure to recall specifics about the incident on cross-examination.  But an "expert's opinion regarding a mental disorder . . . is admitted only to inform the jury of the effect a certain medical condition may have on the witness.  [Citation.]  The expert is not allowed to give an opinion on whether a witness is telling the truth because the determination of credibility is not a subject sufficiently beyond common experience that the expert's opinion would assist the trier of fact." (*People v. Long* (2005) 126 Cal.App.4th 865, 871.)

In sum, the proffered expert testimony concerning the credibility and reasonableness of defendant's claimed belief trenched on the province of the jury, and the trial court did not abuse its discretion in excluding it.

### No Constitutional Error

Defendant maintains the exclusion of evidence of B.K.'s prior violent conduct and proposed expert testimony on the fight or flight response denied him his due process right to a fair trial.  He urges the evidentiary rulings "permitted the jury to convict [him] 'on a lesser showing than due process requires,' "[9] and negatively impacted "the viability of [his] defense [which]

---

[9] Defendant relies on *Victor v. Nebraska* for this claim, which held: "The Due Process Clause requires the government to prove a criminal defendant's guilt beyond a reasonable doubt, and trial courts must avoid defining reasonable doubt so as to lead the jury to convict on a lesser showing than due process requires." (*Victor v. Nebraska* (1994) 511 U.S. 1, 22.)

depended almost entirely upon his own testimony." He therefore maintains prejudice must be assessed under the *Chapman* standard[10] because the exclusion of the evidence was federal constitutional error.

"The United States Constitution guarantees criminal defendants a meaningful opportunity to present a defense. [Citation.] Evidence that falls short of exonerating a defendant may still be critical to a defense." (*People v. Cash* (2002) 28 Cal.4th 703, 727 (*Cash*).) "In general, the ' "[a]pplication of the ordinary rules of evidence . . . does not impermissibly infringe on a defendant's right to present a defense." [Citations.]' [Citations.] [¶] . . . [¶] Although the complete exclusion of evidence intended to establish an accused's defense may impair his or her right to due process of law, the exclusion of defense evidence on a minor or subsidiary point does not interfere with that constitutional right. [Citation.] Accordingly such a ruling, if erroneous, is 'an error of law merely,' which is governed by the standard of review announced in *People v. Watson* (1956) 46 Cal.2d 818, 836. . . ." (*People v. Cunningham* (2001) 25 Cal.4th 926, 998–999; see *People v. McNeal* (2009) 46 Cal.4th 1183, 1203 ["Because the trial court merely rejected some evidence concerning a defense, and did not preclude defendant from presenting a defense, any error is one of state law and is properly reviewed under *People v. Watson*. . . ."].)

"[T]he application of the ordinary rules of evidence under state law does not violate a criminal defendant's federal constitutional right to present a

---

Defendant raises no issue regarding the jury instructions on reasonable doubt, nor does he explain how the evidentiary rulings allowed conviction on a lesser showing than beyond a reasonable doubt.

[10] "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." (*Chapman v. California* (1967) 386 U.S. 18, 24.)

defense, because trial courts retain the intrinsic power under state law to exercise discretion to control the admission of evidence at trial." (*People v. Abilez* (2007) 41 Cal.4th 472, 503.) "Although completely excluding evidence of an accused's defense theoretically could rise to this level, excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense. [Citation.] If the trial court misstepped, '[t]he trial court's ruling was an error of law merely; there was no refusal to allow [defendant] to present a defense, but only a rejection of some evidence concerning the defense.' " (*People v. Fudge* (1994) 7 Cal.4th 1075, 1103.) "Accordingly, the proper standard of review is that announced in *People v. Watson* . . . and not the stricter beyond-a-reasonable-doubt standard reserved for errors of constitutional dimension." (*Ibid.*)

The court in *Cash* considered the due process issue in the context of exclusion of prior bad acts of the victim. In that case, defendant, charged with murder, sought to introduce evidence of the victim's "past violent reprisals for unpaid debts." (*Cash*, *supra*, 28 Cal.4th at p. 726.) The defendant claimed the evidence "was not character evidence of [the victim's] prior bad acts . . . , but was evidence of [the victim's] conduct that was part of the events surrounding the crime." (*Ibid.*, italics omitted.) The court concluded the evidence was properly excluded, noting the victim's "customary debt collection practices were not relevant to show defendant's state of mind at the time he killed [the victim] unless he knew of those practices." (*Ibid.*) The court rejected defendant's claim that the exclusion of this evidence had the effect of preventing him from presenting a defense, noting defendant presented other evidence about the victim being "adamant about being repaid," and "forcibly evicted" another man, in defendant's presence for nonpayment of rent. (*Id.* at p. 727.)

Likewise, here, "the trial court's rulings did not prevent defendant from presenting evidence" from which the jury might have concluded the shooting was in self-defense. (*Cash, supra,* 28 Cal.4th at p. 727.) Defendant himself testified B.K. pulled a gun and advanced on him, and that he fired shots in self-defense. Although the court excluded testimony by defendant's proposed psychological expert, it allowed the testimony of a coordinator with the San Francisco Street Violence Intervention Program regarding many of the same topics. The coordinator testified there is "a lot of gun violence" in the projects, specifically Potrero Hill. He explained there was a significant issue with Post-Traumatic Stress Disorder in the community, and residents often have a heightened sense of danger. The belief is "if I have the certain fear and I see someone and I know that there is a possibility that this person might be coming to harm me, I don't want to do anything but now I have to jump on defense because I don't want to die." The coordinator also testified as to the fight or flight response: "some people . . . have a tendency to flight, right? That's to run and to get out of the way. And then you have some people who when they are faced with adversity they fight. So it really depends on the actual individual how they respond." Lastly, the coordinator testified as to B.K.'s character, noting he was a client of the Violence Intervention Program who was "in risk and high risk," meaning he was on probation or parole and either a victim of a violent crime or a perpetrator.

Since we have rejected defendant's claims of error, we need not consider whether any supposed error was prejudicial. In any case, there was no prejudice.

As we have recited, security footage of the scene showed defendant heading upstairs with what appeared to be a gun in his outstretched hand, before he ever encountered B.K. and the victim. The neighbor's testimony

20

corroborated the security footage and flatly contradicted defendant's claim that he did not remove his gun from his pocket until threatened by B.K. She testified she saw a man matching defendant's description walking past her window carrying what looked like a "black pipe" in his right hand. As he passed, the neighbor heard "a female voice saying, 'Don't shoot me. Don't shoot me.'" Then she saw S. "running up the stairs . . . into her father-in-law's place," which was in the next building. The neighbor then heard "two or three gunshots," then saw the man walk up the stairs and stop "in front of where [S.] had ran inside." The man "put his hand up and he shot like two or three times like in the door."

Defendant testified he owned and carried a gun on the day of the shooting, even though as a felon he was prohibited from possessing one. When pulled over by police after fleeing the shooting scene in a car at a high rate of speed, he refused to cooperate. In his initial interview with police, defendant made no claim of being threatened by B.K. or acting in self-defense. Instead, he denied knowing why he had been arrested, and stated "somebody tried to throw something and I got out of the car. . . . [¶] . . . [¶] They tried to throw something on my lap, out the door, all the shit." When asked if he was saying his uncle tried to put the gun in his lap, defendant responded: "I ain't saying nothing like that. [¶] . . . [¶] I'm saying it wasn't me. That's what I'm saying." Finally, in a jailhouse recording of defendant and his sister, defendant responded to a question about whether he was drunk and his appearance, apparently at the time of the shooting. He responded "No, no. . . . [¶] . . . [¶] Who look like they in their right mind when they're trying to kill somebody."

21

In sum, even if the evidentiary rulings were erroneous, it is not reasonably probable that defendant would have obtained a more favorable verdict had the rejected evidence been allowed.

***Remand to Consider Whether to Strike the Five-Year Term for a Serious Felony Conviction***

Defendant maintains, and the Attorney General agrees, the case must be remanded for the trial court to consider whether to exercise its discretion to strike the five-year term for a prior serious felony conviction imposed under section 667, subdivision (a)(1).

"Prior to 2019, trial courts had no authority to strike a serious felony prior that is used to impose a five-year enhancement." (*People v. Jones* (2019) 32 Cal.App.5th 267, 272 (*Jones*).) Senate Bill No. 1393 (2017–2018 Reg. Sess.), effective January 2019, after sentencing took place, amended sections 667 and 1385 to give trial courts discretion to strike a defendant's five-year sentence enhancement for a serious felony conviction. (§§ 667, subd. (a), 1385.)

The California Supreme Court recently held that, "under *Estrada*,[11] Senate Bill [No.] 1393 [(2017–2018 Reg. Sess.)] applies to [defendant's] case

---

[11] *Estrada* concluded that, if no contrary indication exists, "When the Legislature amends a statute so as to lessen the punishment it has obviously expressly determined that its former penalty was too severe and that a lighter punishment is proper as punishment for the commission of the prohibited act. It is an inevitable inference that the Legislature must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply. The amendatory act imposing the lighter punishment can be applied constitutionally to acts committed before its passage provided the judgment convicting the defendant of the act is not final." (*In re Estrada* (1965) 63 Cal.2d 740, 745, disapproved on another ground as stated in *Californians for Disability Rights v. Mervyn's, LLC* (2006) 39 Cal.4th 223, 230.)

retroactively because his judgment is not yet final.  Eliminating the prior restriction on the court's ability to strike a serious felony enhancement in furtherance of justice constitutes an ameliorative change within the meaning of *Estrada*." (*People v. Stamps* (2020) 9 Cal.5th 685, 699.)

"We are not required to remand to allow the court to exercise its discretion if 'the record shows that the trial court clearly indicated when it originally sentenced the defendant that it would not in any event have stricken [the] . . . enhancement' even if it had the discretion." (*Jones, supra*, 32 Cal.App.5th at p. 272.)  The trial court here gave no such indication, stating only it did "not have the discretion to strike the prior conviction." Accordingly, remand is appropriate.

### *Correction of the Abstract of Judgment*

Defendant was convicted pursuant to count 2 of violating section 245, subdivision (b), "assault with a semi-automatic firearm."  The abstract of judgment described the conviction in abbreviated fashion as "aslt w/semi/auto rifle on pers."  Both parties agree, as do we, that the abstract of judgment should be corrected to accurately describe the conviction.

## DISPOSITION

The matter is remanded to allow the trial court to exercise the discretion afforded it under Senate Bill No. 1393 (2017–2018 Reg. Sess.) and to issue an amended abstract of judgment to indicate defendant was convicted in count 2 of violating section 245, subdivision (b), assault with a semi-automatic firearm (and to also indicate any change in sentence if the court so exercises its discretion under Sen. Bill No. 1393 (2017–2018 Reg. Sess.)).  The court shall then forward a certified copy of the amended copy of the abstract of judgment to the Department of Corrections and Rehabilitation.  In all other aspects, the judgment is affirmed.

_____

Banke, J.

We concur:

_____

Humes, P.J.

_____

Sanchez, J.

A154955, People v. Kittles

24