Filed 5/17/23  P. v. Dunigan CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C095247 |
| Plaintiff and Respondent, | (Super. Ct. No. STK-CR-FECOD-2017-14755) |
| v. | |
| TYRIENTA JERMAINE DUNIGAN, | |
| Defendant and Appellant. | |

Defendant Tyrienta Jermaine Dunigan was convicted of voluntary manslaughter and possession of a firearm by a felon and sentenced to 4 years plus 25 years to life.  He appeals his conviction on two grounds.[1]  First, he challenges the requirement that everyone in the courtroom had to wear face masks in order to prevent the spread of COVID-19, arguing it deprived him of his constitutional right to confront the witnesses

---

[1]    He does not challenge his sentence, and we thus do not discuss it further.

against him and to a fair trial and an impartial jury. Second, he contends the trial court erred in refusing to allow his expert to testify regarding the use of force in self-defense. We disagree with both arguments, and thus affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Henry Martinez was shot in the back of the head and killed during a gunfight outside of a nightclub on May 29, 2016. Defendant was charged with first degree murder of Martinez (count 1); two counts of attempted murder of Richard Burton and James Ruiz, who were with Martinez when he was shot (counts 2 & 3); and one count of possession of a firearm by a felon (count 7).

The primary evidence in the case was surveillance video from the nightclub and a nearby store. In denying defendant's motion for a new trial, the trial court described the evidence as follows: "This is a very unique situation . . . because the evidence was really the videotape, which speaks for itself. . . . [¶] Here are the facts not in dispute: The victim [i.e., Martinez] and his group [which included Burton and Ruiz] are walking away from the club down the walkway towards the parking lot. A few minutes earlier, Richard Burton was thrown out of the club, and Richard was upset. The defendant [and] his brothers . . . were not involved in this argument. It was between Richard and Paul Ware. We know Richard was armed but had not pulled the gun out. . . . [¶] At one point Richard is walking down the hallway [with Martinez and Ruiz], and the defendant and his brother leave the club, and they also start to walk down the hallway. This is outside the club. At that point guns are drawn and shots are fired. We know that Henry [Martinez] was killed in the shootout. We know that Henry did not have a weapon, and we know that Henry did not fire a weapon."

The surveillance videos have no sound, and no one video shows the entire shooting. In one of the videos from the store, Martinez, Burton, and Ruiz can be seen walking away from the club down a walkway lined with pillars. They look back and appear to react to something, and Burton and Ruiz both fire guns towards the club. In

2

one of the videos from the nightclub, defendant and his brother can be seen exiting the club and walking down the walkway towards Martinez and his group. Defendant walks around a pillar and out of view, people jump or react, and his brother fires a gun in the direction of Martinez and his group.

The parties stipulated that defendant did not fire the shot that killed Martinez. The prosecution's theory was that defendant fired the first shot, his brother fired the fatal shot, defendant aided and abetted his brother in killing Martinez, and defendant attempted to kill Burton and Ruiz. The defense's theory was that Martinez, Burton, and Ruiz were all known gang members and "self-proclaimed killers," that Burton and Ruiz were armed, and that defendant fired his gun in defense of himself and/or his brother.

The jury was instructed on murder, on the lesser included offense of voluntary manslaughter, on self-defense or defense of another as a complete defense to murder or manslaughter, and on attempted murder. The jury found defendant not guilty of the murder of Martinez but guilty of the lesser included offense of voluntary manslaughter and of possession of a firearm by a prohibited person. It found him not guilty of the attempted murder of Burton and Ruiz.

Defendant filed a timely appeal.

## DISCUSSION

## I

### *Mask Requirements*

*A. Additional Background*

Defendant's trial occurred in February 2021, during the COVID-19 pandemic. Prior to trial, he filed a motion in limine, objecting on constitutional grounds to any requirement that he or his attorney, any witness, or potential or actual juror be required to wear face masks or coverings at any time during jury selection or trial. The trial court ruled as follows:

3

"[W]e're still under Governor's orders that people wear face masks and they social distance. And as a court, that's what our presiding Judge has implemented, that's the rule of the court at this time. . . .

"San Joaquin County, last time I looked, has -- we're in one of those top-tier counties where we have zero bed space. We're one of those counties where COVID is extremely rampant. And so in order to comply with the Governor's orders and conduct jury trials, how we get jurors in here, everyone is required to social distance and wear a face mask.

"And I am not going to put the jurors' lives on the line, or the witnesses, or myself, or my staff, by coming in here without face masks. We are following the law and we are following the Governor's orders.

"So everybody will wear face masks. . . . [W]hat I can do, though, for the witnesses, if you'd like, I do have plastic shields that are in compliance with the Governor's order because they have a bottom piece to them. And I can have all the witnesses wear the plastic shields so you can see their entire face while they're testifying.

"So if you'd like me to do that, . . . , I can supply the actual witnesses with the plastic shield.

"I just don't have enough shields for the jury. If you want the jury to wear plastic shields, . . . you're going to have to supply them."

Defense counsel responded, "Well, I don't have any shields, but *I think my client would be fine with the witnesses wearing shields at this point. We'll accept that offer, Judge*."[2]

---

[2]    The People argue the italicized language demonstrates defendant invited error when he accepted the trial court's offer, and thus may not challenge the judgment on appeal because of any claimed error regarding face masks. Alternatively, the People argue defendant forfeited any argument about face masks when he accepted the trial court's offer. We disagree. Defendant filed a motion in limine objecting to any mask requirement, and " ' "[a]n attorney who submits to the authority of an erroneous, adverse ruling *after making appropriate objections or motions*, does not waive the error in the ruling by proceeding in accordance therewith and endeavoring to make the best of a bad

Defendant now challenges the trial court's ruling that everyone in the courtroom had to wear face masks or plastic shields throughout the trial, arguing it violated his constitutional right to confront the witnesses against him, to a fair trial, and to a trial by an impartial jury. We disagree.

### B. Witnesses Wearing Masks

The confrontation clause of the Sixth Amendment, applicable to the states through the 14th Amendment, provides, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." (U.S. Const., 6th Amend.) The clause " 'provides two types of protections for a criminal defendant: the right physically to face those who testify against him, and the right to conduct cross-examination.' " (*Coy v. Iowa* (1988) 487 U.S. 1012, 1017.) Defendant's right to physically face or confront the witnesses against him, however, is not absolute. Instead, although the confrontation clause " 'reflects a *preference* for face-to-face confrontation at trial,' " that preference " 'must occasionally give way to considerations of public policy and the necessities of the case.' " (*Maryland v. Craig* (1990) 497 U.S. 836, 849.) In *Maryland v. Craig*, the United States Supreme Court held, "a defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial . . . [1] where denial of such confrontation is necessary to further an important public policy and only [2] where the reliability of the testimony is otherwise assured." (*Id.* at p. 850, bracketed numbers added.) Where, as here, the facts are largely undisputed, our review of the trial court's determination that its mask order did not violate defendant's rights under the confrontation clause is de novo. (*People v. Alvarez* (2022) 75 Cal.App.5th 28, 36 (*Alvarez*).)

---

situation for which he was not responsible." ' " (*Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 212-213, italics added.)

5

Applying the two-pronged test set forth in *Maryland v. Craig*, all three California cases that have considered the issue have concluded that, "due to the unique and substantial public health risks created by the ongoing global pandemic, the confrontation clause is not violated by having a witness testify in a criminal proceeding with a mask covering the nose and mouth." (*People v. Lopez* (2022) 75 Cal.App.5th 227, 232 (*Lopez*); see also *Alvarez, supra*, 75 Cal.App.5th at pp. 36-39; *People v. Edwards* (2022) 76 Cal.App.5th 523, 525-527 (*Edwards*).) Numerous federal and out-of-state cases have agreed (and we note defendant cites no cases that have held otherwise). (See, e.g., *Lopez, supra*, at p. 232 [collecting federal cases]; *State v. Modtland* (Minn.Ct.App. 2022) 970 N.W.2d 711, 716-720; *Johnson v. State* (Ind.Ct.App. 2023) 201 N.E.3d 1198; *State v. Cuenca* (Idaho 2023) 524 P.3d 882; *People v. Garcia* (Colo.App., Dec. 22, 2022, No. 20CA1697) 2022 Colo.App. Lexis 1897; *State v. Daniels* (Tenn.Crim.App. 2022) 656 S.W.3d 378; *State v. Hadlock* (Ohio.Ct.App., Sept. 13, 2021, No. 2020-A-0054) 2021 Ohio.App. Lexis 3097.) We agree with this line of authority.

*Lopez, supra*, 75 Cal.App.5th 227 was one of the first California cases to address this issue. There, the court found both prongs of the *Maryland v. Craig* test were satisfied because (1) requiring witnesses to wear masks was necessary to further an important public policy, and (2) the reliability of the witnesses' testimony was otherwise assured. As to the first prong of the test, the *Lopez* court found " 'the mask requirement is necessary to further an important public policy: ensuring the safety of everyone in the courtroom in the midst of a unique global pandemic. Without this procedure, everyone in the courtroom would face the risk of being infected with a lethal virus. The Court's masking requirement is based upon the best available scientific information and advice. . . . The wearing of the mask not only protects the wearer of the mask, but more significantly, protects others who may be in the same room with the person. . . . Given the [Center for Disease Control and Prevention] recommendations, which are based on the best available science in this area, the Court finds that its social distancing and mask

6

protocols are necessary and essential to protect the courtroom participants during a trial.' " (*Id.* at pp. 233-234.) All California cases that have considered this issue have agreed, and we do as well. (See *Edwards, supra*, 76 Cal.App.5th at p. 526; *Alvarez, supra*, 75 Cal.App.5th at p. 36.)

Defendant suggests that face masks were not necessary because social distancing alone would have been sufficient to ensure the safety of everyone in the courtroom. As the trial court noted, however, the Governor had ordered *both* "that people wear face masks and they social distance." Defendant cites nothing in the record, and no evidence or legal authority, that supports his suggestion that social distancing alone would have been sufficient to ensure the safety of everyone in the court room. (See, e.g., *Lopez, supra*, 75 Cal.App.5th at p. 235 ["We are also not persuaded by defendant's argument the court could have reconfigured the courtroom to allow witnesses to testify maskless and be socially distanced from all other courtroom participants"]; *Edwards, supra*, 76 Cal.App.5th at p. 526 [citing Centers for Disease Control and Prevention's recommendation that people wear masks].) We thus find that requiring witnesses to wear masks was necessary to further the important public policy of ensuring the safety of everyone in the courtroom.

As for the second prong of the *Maryland v. Craig* test, the *Lopez* court found that the reliability of witness testimony was otherwise assured even though they wore masks. (*Lopez, supra*, 75 Cal.App.5th at p. 234.) "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." (*Maryland v. Craig, supra*, 497 U.S. at p. 845.) The clause ensures the reliability of witness testimony in four ways: (1) by requiring the witness to testify in the physical presence of the defendant; (2) by requiring the witness to testify under oath; (3) by forcing the witness to submit to cross-examination; and (4) by allowing the jury to observe the witness's demeanor, which helps it assess the witness's credibility. (*Id.* at

7

pp. 845-846.) We agree with *Lopez* and other cases that hold mask requirements do not meaningfully diminish the reliability of witness testimony, because witnesses still testify in the physical presence of the defendant, they still testify under oath, and they are still subject to unfettered cross-examination. (See *Lopez, supra*, at p. 234; see also *Alvarez, supra*, 75 Cal.App.5th at p. 38.) As numerous courts have found, a mask does not "significantly obstruct the jury's ability to assess witness demeanor. The jurors [can] see the witnesses' eyes, hear the tone of their voices, and assess their overall body language." (*Lopez, supra*, at p. 234.) "Although face masks cover[] the witnesses' mouths and the lower part of their noses, significant aspects of their appearance, including the eyes, tops of the cheeks, and the body, [are] readily observable as [is] posture, tone of voice, cadence and numerous other aspects of demeanor: 'Demeanor includes the language of the entire body [and] jurors will be able to observe most facets of the witnesses' demeanor. They can observe the witnesses from head to toe. They will be able to see how the witnesses move when they answer a question; how the witnesses hesitate; how fast the witnesses speak. They will be able to see the witnesses blink or roll their eyes, make furtive glances, and tilt their heads. The Confrontation Clause does not guarantee the right to see the witness's lips move or nose sniff, any more than it requires the jurors to subject the back of a witness's neck to a magnifying glass to see if the hair raised during particularly probative questioning.' " (*Alvarez, supra*, at p. 38.) We agree.

Finally, we note that defendant's confrontation clause challenge is particularly weak in this case because the court provided witnesses with plastic face shields, and the jury was thus able to observe their entire face while they testified. Defendant contends that face shields prevented the jury from observing witnesses' demeanor because "face shields (and glasses under face shields) are prone to fogging up from breathing and speaking during testimony." However, he points to nothing in the record that suggests

8

face shields or glasses actually fogged up, or that the jury was unable to observe all aspects of the witnesses' demeanor.[3]

We thus find defendant's right to confront the witnesses against him was not violated by requiring witnesses to wear plastic face shields while testifying.

*C. Jurors Wearing Masks*

Defendant also argues that requiring jurors to wear masks during voir dire and trial violated his right to a fair trial and an impartial jury. He cites a 130-year-old United States Supreme Court case for the proposition that the Constitution guarantees a defendant the right "to be brought face to face with the jurors at the time . . . [peremptory] challenges [are] made" (*Lewis v. United States* (1892) 146 U.S. 370, 376), and a more recent case for the proposition that the purpose of voir dire is to "elicit from prospective jurors candid answers about intimate details of their lives. The [questioner] . . . must scrutinize not only spoken words but also gestures and attitudes of all participants to ensure the jury's impartiality," (*Gomez v. United States* (1989) 490 U.S. 858, 874-875). He argues that masking requirements denied him "face-to-face interaction with the prospective jurors." He also argues that requiring jurors to wear masks during trial prevented him "from truly coming face to face with the jurors who would decide his fate," and from being able to detect jurors' reactions to evidence, and he notes the Supreme Court has recognized a criminal defendant's "Sixth Amendment interests in an unimpaired jury . . . are protected by several aspects of the trial process," including the fact that "during the trial the jury is observable by the court, by counsel, and by court personnel." (*Tanner v. United States* (1987) 483 U.S. 107, 127.) We disagree for the same reasons discussed above—masks were necessary to further an important

---

[3]     He also argues face shields would have prevented the jury from hearing witnesses clearly, but, again, he points to nothing in the record that suggests the jury was unable to hear any witness clearly.

9

public policy, and they did not prevent defendant from coming face-to-face with jurors in a significant way. Although jurors' mouths and noses were covered, defendant could still see their eyes, their foreheads, and the tops of their cheeks, and he could observe numerous aspects of their demeanor, including their body language and posture. Moreover, defendant could fully question prospective jurors during voir dire in order to obtain sufficient information to detect bias, disqualify jurors for cause, and intelligently exercise his peremptory challenges. We thus agree with the numerous courts that have concluded the Constitution is not violated if jurors are required to wear masks during voir dire or trial. (See *People v. Garcia, supra*, 2022 Colo.App. Lexis 1897 at pp. *12-*13; *Prince v. State* (Md.Ct.Spec.App. 2022) 284 A.3d 795, 806-808; *U.S. v. Trimarco* (E.D.N.Y., Sept. 1, 2020, No. 17-CR-583 (JAM)) 2020 U.S.Dist. Lexis 159180, *16; *U.S. v. Crittenden* (M.D.Ga., Aug. 21, 2020, No. 4:20-CR-7 (CDL)) 2020 U.S.Dist. Lexis 151950, *8; *U.S. v. Tagliaferro* (S.D.N.Y. 2021) 531 F.Supp.3d 844, 851.)

### D. Defendant and His Counsel Wearing Masks

Defendant also challenges the requirement that he and his counsel had to wear face masks throughout the trial. He cites Justice Kennedy's concurring opinion in *Riggins v. Nevada* (1992) 504 U.S. 127 for the following proposition: "It is a fundamental assumption of the adversary system that the trier of fact observes the accused throughout trial . . . . This assumption derives from the right to be present at trial, which in turn derives from the right to testify and rights under the Confrontation Clause. [Citation.] At all stages of the proceedings, the defendant's behavior, manner, facial expressions, and emotional responses, or their absence, combine to make an overall impression on the trier of fact, an impression that can have a powerful influence on the outcome of the trial." (*Id.* at p. 142 (conc. opn. of Kennedy, J.); see also *People v. Gurule* (2002) 28 Cal.4th 557, 598, fn. 8 [quoting *Riggins v. Nevada*].) Assuming, without deciding, that a criminal defendant has a constitutional right to have the jury observe his demeanor during trial, and for the reasons discussed above, we find that

10

requiring masks passes constitutional muster because it (1) was necessary to further an important public policy, and (2) did not significantly impair that right because the jury could still observe most aspects of defendant's demeanor even though his mouth and nose were covered. (See, e.g., *People v. Garcia, supra*, 2022 Colo.App. Lexis 1897 at pp. *13-*16 [reconfiguring courtroom and seating some jurors in gallery where they could not see the defendant's face did not violate Constitution because seating arrangements were necessary to ensure safety of everyone in court in the midst of a global pandemic and jurors could still assess the defendant's demeanor to some degree].)

Finally, defendant argues the fact that his counsel had to wear a mask during trial hindered his defense. To support his argument, he cites the following comment defense counsel made during closing argument: "Thanks to each and every one of you for taking the time out of your life to serve on this jury. . . . Particularly, I'd like to thank you for taking this time now during this pandemic to come down here, because it puts us all at risk. I've had it, the COVID. I'm recovering from it, and it still makes it hard to talk, hard to breathe. . . . *So I know sometimes it's hard to hear me with the mask*, and I do have some trouble breathing, but I'd ask you hold that against me and not against my client in this case." This lone comment does not demonstrate either that the jury was unable to hear any of the testimony that was proffered at the trial, or that counsel's mask hindered his ability to provide defendant with a vigorous defense.

## II

### *Expert Testimony*

*A. Additional Background*

Prior to trial, defendant filed a motion in limine to admit testimony from Barry Brodd, who was described as "a defense expert in police practices and use of force." Brodd was a police officer for 29 years, and he taught use of force at the police academy for 35 years. Defendant argued most jurors have no personal experience of being in situations where they might have to defend themselves or others, whereas "police officers

11

routinely encounter situations in which they are exposed to all manner of threats to their personal safety, including, all too often, threats of bodily injury or death. They commonly learn of appropriate and inappropriate ways to respond to such situations, including techniques and options to de-escalate. . . . [¶] Some police officers, like Barry Brodd, study these situations for years and years. Their experience, training and expertise qualifies them to *train other police officers* in these issues. Surely that level of expertise can assist lay jurors in analyzing the nuances of a reasonable person's response to a deadly threat, the degree of threat, the necessity to use force in response and the degree of force which is necessary."

At an Evidence Code section 402 hearing, Brodd testified he had qualified as a use-of-force expert in 20 to 25 cases, and that not all of those cases involved use of force by law enforcement. When asked to identify those cases involving civilian use of force, however, the only cases he identified were civil cases that involved the use of force by a police officer or security guard; none were criminal cases where the defendant was charged with killing or otherwise using force again another civilian. Brodd acknowledged that if he were allowed to testify in this case, it would be the first time he had testified as an expert in a criminal case involving the use of force by a civilian (although he stated he had consulted on such cases). When asked whether his training and expertise related solely to police or law enforcement use of force, he responded, "*In some respects*. So I used to teach chemical agents to civilians, and I was also a use-of-force instructor for Wal-Mart, Incorporated. And in those situations, I explained between what police officers can do and what civilians can do as far as it relates to use-of-force issues." When asked whether his experience and training included situations "where regular people . . . who are not police officers are exposed to threats of bodily injury or death," he responded, "Yes," but did not expand.

Defense counsel asked Brodd a series of questions about his experience training police officers, on the nature of police work, and on police use of force in general. Brodd

also testified that "ordinary citizens" have the right to use force in self-defense, and that an ordinary citizen's right to use force in self-defense is generally the same as a police officer's right to use force in self-defense. He was asked how he could assist the average person understand situations where a civilian was threatened and had to use force in self-defense, and he responded, "So as an instructor, I'm used to educating people with maybe less experience than I [have] or people who aren't law enforcement professionals to understand what the job of a police officer is and what the rights of a civilian are as it relates to similar use-of-force situations."

Brodd was also asked a series of hypothetical questions. He was asked whether a police officer who was confronted by three men with guns in the parking lot of a nightclub at around 2:00 a.m. would reasonably believe he or she was at risk for bodily injury or death, and he responded, "Yes." When asked why, he responded, "That's a common-sense element." He was also asked a more detailed hypothetical about whether a civilian who was "confronted by three men with Big Bore semiautomatic pistols, [and he] knew at least a couple of them had pistols, in the parking lot of a nightclub and he knew those three men were Northside Gangster Crips and [he] had seen . . . a gangster rap video featuring those same three men and in that rap song these same three men declared themselves to be killers,[4] would it be reason for the . . . person who saw this behavior to believe he's at risk of bodily injury or death from those fellas?" He responded, "Yes," and further explained a citizen in that situation would have the same reasonable fear of death or bodily injury as a police officer.

---

**4**     Detective Julio Morales, who used to work in the gang violence suppression unit, testified that Martinez, Ruiz, and Burton were members of a gang called the Northside Gangster Crips. He also identified Martinez, Ruiz, and Burton in a music video that was played for the jury, and he testified the lyrics of the song in the video promoted the gang as "being willing to carry a gun and shoot if they have to," and of being "killers." There was no evidence that defendant was in a gang, and his sister testified defendant and his brother were not in a gang and were not rivals of the Northside Gangster Crips.

13

Finally, Brodd was asked, "At what point did it become necessary for [defendant] to shoot," and he responded, "Probably when he was seeing what he perceived to be the imminent threat of serious bodily injury or death." He then clarified, "*if he saw these gang members pointing guns at him*, I would feel at that time, yes, he was in imminent jeopardy and entitled" to use force in self-defense. He admitted, however, that he could not tell from the surveillance videos what defendant was looking at or what he saw when he fired his gun, and that he could not tell whether Martinez, Ruiz, or Burton were pointing their guns at defendant, firing at defendant, aiming at defendant, or had defendant in their line of sight.

The trial court disallowed Brodd's testimony, noting the question of whether a particular use of force was reasonable under all the circumstances is for the jury to decide, and "[i]n this case, the defendant did not raise any circumstance that the jury may not understand with regard to self-defense. In other words, like [Brodd], the jury can review the video, hear the evidence of gang involvement, and make a decision on their own whether or not the defendant truly acted in self-defense." Defendant challenges the trial court's ruling excluding Brodd's testimony.

*B. Analysis*

"We review the trial court's ruling on the admissibility of expert testimony for abuse of discretion." (*People v. Brown* (2016) 245 Cal.App.4th 140, 157.) The trial court's discretion, however, must be exercised within the confines of the relevant legal principles—here, the legal principles governing the admission of expert testimony. (*Ibid*.) "The principles of law governing admission of expert testimony are well settled." (*Ibid*.) Evidence Code section 801 provides that expert testimony is only admissible if it "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).) " 'Expert opinion is not admissible,' however, 'if it consists of inferences and conclusions which can be drawn as easily and intelligently by the trier of fact as by the witness.' " (*People v.*

14

*Sibrian* (2016) 3 Cal.App.5th 127, 133.) Accordingly, " ' " '[w]here the jury is just as competent as the expert to consider and weigh the evidence and draw the necessary conclusions, then the need for expert testimony evaporates.' " ' [Citation.] Expert testimony will be excluded ' " 'when it would add *nothing at all* to the jury's common fund of information, i.e., when "the subject of inquiry is one of such common knowledge that men [and women] of ordinary education could reach a conclusion as intelligently as the witness." ' " ' " (*Brown, supra*, at p. 157.)

The trial court excluded Brodd's testimony because it found the jury was just as competent as Brodd would be in considering and weighing the evidence of self-defense and drawing the necessary conclusions, explaining, "In this case, the defendant did not raise any circumstance that the jury may not understand with regard to self-defense. In other words, like [Brodd], the jury can review the video, hear the evidence of gang involvement, and make a decision on their own whether or not the defendant truly acted in self-defense."

Defendant challenges that ruling, arguing Brodd's testimony "was related to a subject well beyond common experience." We disagree. The jury was instructed with CALCRIM No. 505 (justifiable homicide in self-defense), which states: "The defendant acted in lawful self-defense or defense of another if: [¶] 1. The defendant *reasonably believed* that he or [his brother] was in imminent danger of being killed or suffering great bodily injury. [¶] 2. The defendant *reasonably believed* that the immediate use of deadly force was necessary to defend against that danger. [¶] AND [¶] 3. The defendant used no more force than was *reasonably necessary* to defend against that danger." (Italics added.) CALCRIM No. 505 also states, "Defendant's beliefs must have been reasonable, and he must have acted only because of that belief. *The defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation*. If the defendant used more force than was reasonable, the killing or attempted killing was not justified." (Italics added.) And: "When deciding whether the

15

defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed."

As the above language shows, the law of self-defense is premised on what a reasonable person in the defendant's situation would have believed and done. Because a jury is composed of reasonable people (see *People v. Wilson* (2021) 11 Cal.5th 259, 298), we find that, as a general rule, the issue of what a reasonable person in the defendant's situation would have believed and done is not something "that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).) Indeed, it appears even Brodd would agree with this, because when he was asked why it would be reasonable for someone confronted by three men with guns to believe he or she was at risk for bodily injury or death, he responded, "*That's* a *common-sense* element." We agree. Whether someone in defendant's situation would reasonably believe he needed to use deadly force in self-defense is common sense, and an expert's views on the issue would not assist the trier of fact.

Defendant cites *People v. Sibrian, supra*, 3 Cal.App.5th 127 to support his argument that his expert should have been allowed to testify. *Sibrian* is distinguishable, however, because it involved expert testimony on police use of force, not civilian use of force. The defendant in *Sibrian* was pulled over by the police after they observed him running two red lights. (*Id.* at p. 129.) He was " 'slurring and rambling' " and the police believed he was intoxicated. (*Ibid.*) They ordered him out of his car several times, but he refused and gripped his steering wheel with both hands. The police then tried to pull him out of the car, but were unable to do so because he was flailing his body. In an effort to remove him from the vehicle, the officers hit and used a taser on the defendant. (*Id.* at pp. 129-130.)

The defendant was charged with resisting an officer. He claimed the officers were using unreasonable or excessive force on him, which, if proven, would be a complete

16

defense to the charge because "an officer must be acting lawfully when the resistance occurs," and "[a]n officer using excessive force is not acting lawfully." (*People v. Sibrian, supra*, 3 Cal.App.5th at p. 133.) The prosecution was thus required to prove as part of its case that the officers were acting lawfully and were not using excessive force. (*Ibid*.) In order to prove its case, the prosecution introduced testimony from an expert on police training and tactics and use of force. (*Id.* at p. 130.) The trial court allowed the expert's testimony, finding it covered matters beyond the common experience of the jury. (*Id*. at pp. 133-134.) The appellate court agreed, concluding the expert's testimony was properly admitted because it added something to the jury's common fund of knowledge and "provided relevant context and a basis for evaluating the officers' handling techniques and choice of assistive tools." (*Id*. at p. 136.)

Defendant argues this case is similar to *Sibrian*, because both cases involved the use of force in a situation that was "sufficiently complex that [it was] beyond common experience and the ability of the average person to comprehend." We disagree. Unlike *Sibrian*, this case did not involve the progressively escalating use of force by police officers attempting to arrest a subject they observed breaking the law, and it did not involve uses of force that are outside the common experience of lay jurors (i.e., the use of a taser or distraction blows, the danger posed by a suspect lying on the ground with his hands underneath his body, etc.). Instead, it involved a gunfight outside a bar between two groups of civilians. We are not convinced expert testimony would have assisted the jury in deciding, based on all the evidence before it, whether defendant was justified in acting as he did.

Defendant also cites *People v. Reardon* (2018) 26 Cal.App.5th 727. Like *Sibrian*, however, *Reardon* is again distinguishable because it involved expert testimony on police use of force, not civilian use of force. *Reardon*, like *Sibrian*, involved a criminal defendant who challenged a conviction for resisting an officer by arguing the officer used excessive force against him. The defendant sought to introduce the testimony of an

expert on police use of force who was prepared to testify that some of the force used by officers was not warranted in the circumstances. (*Id.* at pp. 734-735.) The trial court excluded the testimony, finding it would invade the province of the jury and the probative value of the testimony would be outweighed by the risk of jury confusion and delay. (*Id.* at p. 735.) After the officers involved were permitted to testify about their reasons for using force, the defendant renewed his request to introduce testimony from his expert in order to respond in kind. (*Ibid.*) The trial court, once again, denied the request, noting the expert's proposed testimony " 'would address an ultimate issue in this case.' " (*Id.* at p. 736.)

The defendant was convicted of resisting an executive officer. On appeal, he argued the trial court erred in refusing to allow him to introduce expert testimony, and the appellate court agreed. The trial court stated it was excluding the expert's testimony because it would " 'invade[] the province of the jury' " and it " 'would address an ultimate issue.' " (*People v. Reardon, supra*, 26 Cal.App.5th at pp. 735, 736.) The appellate court found this reason was "unsound" because Evidence Code section 805 provides expert testimony "is not inadmissible simply because it embraces the ultimate issue to in the case." (*Reardon*, at pp. 737, 738.) Instead, the test for admitting expert testimony is whether it is " '[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.' " (*Id.* at pp. 737-738, quoting Evid. Code, § 801.) The court explained, "Defendant was struck repeatedly by batons after he was on the ground. He wanted the expert to explain to the jury some ' "subtleties of police procedure and practice" ' [citation], specifically, the proper use (and *non*use) of batons and the niceties of the proper application of escalating force on a noncompliant person. He wanted to bolster the view that his act of initial resisting alone did not give multiple officers free rein to strike him repeatedly with batons. If the officers could have restrained him through lesser means known to them based on their training and the facts as they reasonably perceived them, he might establish unreasonable

18

force was used." (*Reardon*, at p. 739, fn. omitted.)  Because the expert's testimony focused on "subtleties of police procedure and practice" that are generally beyond common experience, it should have been admitted.[5]  (*Reardon*, at pp. 739-740.)

Again, this case is different because it does not involve "subtleties of police procedure and practice" like the escalating use of force by police on a noncompliant suspect, or the use of force on areas of the body that police are trained not to hit. Defendant fails to convince us that his right to use self-defense in the circumstances of this case is beyond the jury's common experience.

Defendant cites, but does not discuss, *People v. Sotelo-Urena* (2016) 4 Cal.App.5th 732.  We find *Sotelo-Urena* is instructive because, like this case, it involved a criminal defendant charged with murder who tried to offer expert testimony related to self-defense.  The defendant in *Sotelo-Urena* was a 31-year-old homeless man who was convicted of murder after he admittedly stabbed another homeless man to death. (*Id.* at pp. 737-739.)  He claimed he believed he needed to use lethal force to defend himself because the victim had stabbed him a few weeks earlier and was going to do it again if the defendant did not act first.  (*Id.* at p. 741.)  He sought to admit testimony from an expert on homelessness who would have explained that homeless individuals are exposed to violence at a substantially higher rate than housed individuals, and that this tends to create a greater than normal sensitivity to perceived threats of violence.  (*Id.* at p. 742.)  The trial court excluded the testimony, noting " 'we all deal with homelessness' " and "I don't think there's specialized knowledge here that is relevant to specific issues in the case."  (*Id.* at p. 743.)

On appeal, the defendant argued the trial court erred in excluding the expert's testimony, and the appellate court agreed.  It noted, "if the jury found that defendant

---

**5**     The court nonetheless affirmed the defendant's conviction because he did not show prejudice.  (*People v. Reardon, supra*, 26 Cal.App.5th at pp. 740-741.)

actually and reasonably believed he needed to use lethal force to defend himself from [the victim], then he acted in self-defense, a complete defense to the murder charge. If it found he actually but unreasonably believed he needed to use lethal force, then he lacked the malice required for a murder finding and was guilty only of voluntary manslaughter. . . . Defendant's actual belief in the need to use lethal force, and the reasonableness of that belief, were thus squarely at issue in his trial." (*People v. Sotelo-Urena, supra*, 4 Cal.App.5th at p. 744.) The court then found the expert's opinion was relevant to the defendant's actual belief in the need to use force because it would have explained his "heightened sensitivity to aggression and why he was inclined to react more acutely to the perceived threat," and it was relevant to the reasonableness of that belief because it would have helped the jury determine "whether a reasonable person in defendant's position would have believed" he needed to defend himself. (*Id*. at pp. 746, 752.)

Finally, and as relevant here, the court found the expert's opinion on the psychological impact of chronic homelessness was sufficiently beyond common experience that it would have assisted the jury, explaining, "jurors in a case involving homeless violence may have a rudimentary understanding of the hazards of life on the street, but the realities of being homeless for a long period of time are beyond the understanding and life experience of the average juror." (*People v. Sotelo-Urena, supra*, 4 Cal.App.5th at p. 753.) It concluded, "the extent to which the homeless are confronted with persistent danger, as demonstrated by the evidence of the violence experienced by the homeless, and the psychological consequences of experiencing chronic homelessness, is beyond the ken of most." (*Id*. at pp. 755-756.) In reaching this conclusion, the *Sotelo-Urena* court also noted that expert testimony has been allowed in cases where a victim of domestic violence is charged with killing his or her abuser. Expert testimony is allowed in such cases to help the jury understand how the psychologic impact of domestic violence can alter someone's perception of danger and affect their belief in the need to

20

defend against that danger, and to counteract "commonly held misconceptions and intuitive but erroneous assumptions about domestic violence victims." (*Id*. at p. 754; see *id*. at pp. 746, 751, citing *People v. Aris* (1989) 215 Cal.App.3d 1178 & *People v. Humphrey* (1996) 13 Cal.4th 1073.)

*Sotelo-Urena* shows that, in certain unique circumstances that are beyond common experience (i.e., chronic homelessness, domestic violence), expert testimony may be admissible on the issue of whether a defendant actually and reasonably believed he or she needed to act in self-defense. Those circumstances are not present here, and, as the trial court ruled, "defendant did not raise any circumstances that the jury may not understand with regard to self-defense."

We acknowledge the evidence showed defendant knew Martinez and his group were gang members, but defendant does not explain how his knowledge of Martinez's group's gang membership affected his belief that he was in imminent danger or that he needed to use deadly force to defend against that danger. We also note that Brodd never professed to be an expert on gangs or gang culture, and he never explained or addressed how or why the victim's gang membership would affect the reasonableness of someone's belief that deadly force was necessary. Instead, Brodd testified that if someone is confronted by three men with guns, it is "common-sense" to believe that the immediate use of deadly force is necessary to defend against an imminent danger. As described by Brodd, then, the threat that justifies the use of force is being confronted by men with guns, not being confronted by gang members with guns.

It is no doubt true that most jurors have never had to act in self-defense, but that fact, standing alone, does not turn self-defense into a subject that is beyond a jury's common experience. Instead, we find that a jury composed of reasonable people is just as capable as an expert on police use of force in reviewing all the evidence and deciding whether defendant actually and reasonably believed in light of all the circumstances that he needed to use lethal force to defend himself or his brother from Martinez and his

21

group, and that Brodd's opinion on that issue would not have assisted the jury.  The trial court thus did not err in excluding Brodd's testimony.

**DISPOSITION**

The judgment is affirmed.

|   | <u>        /s/                      </u> |
| - | EARL, J. |

We concur:

| <u>      /s/                     </u> |
| ROBIE, Acting P. J. |

| <u>      /s/                     </u> |
| MCADAM, J.* |

---

\* Judge of the Yolo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

22